UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Gregory H. Woods |
| | : | |
| v. | : | Crim. No. 23-320 |
| | : | |
| SLAVA (STANLEY) KAPLAN | : | |
| | : | |

---

## SENTENCING MEMORANDUM OF
## DEFENDANT STANLEY KAPLAN

---

**Lowenstein Sandler LLP**
Rachel Maimin
Logan Vickery
1251 Avenue of the Americas
New York, NY 10020
212.262.6700
*Attorneys for Defendant Stanley Kaplan*

## **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................1

II.   FACTUAL BACKGROUND .................................................................3

     A.    Personal History.................................................................3

     B.    The Offense Conduct ........................................................6

     C.    Repeated Efforts to Cooperate and Guilty Plea ........................6

     D.    Post-Arrest Efforts to Obtain a Job ......................................8

     E.    The Guidelines Calculation.................................................8

III.  A SENTENCE OF PROBATION IS WARRANTED UNDER SECTION 3553(A) ...........................................................................................8

     A.    The Seriousness of the Offense and the Need to Provide Just Punishment ......................................................................9

     B.    The History and Characteristics of the Defendant.................11

     C.    The Interests of Specific and General Deterrence .................15

IV.   CONCLUSION.................................................................................15

## I.      <u>PRELIMINARY STATEMENT</u>

We respectfully submit this sentencing memorandum on behalf of defendant Dr. Stanley Kaplan, who is scheduled to be sentenced on January 5, 2024.

Under the unique circumstances of this case, a sentence of probation is sufficient but not greater than necessary to meet the statutory sentencing factors.  Stanley is a physician with no prior criminal history who committed this offense in a two-week period during a once-in-a-lifetime crisis: when he was on the COVID front lines working 80-hour weeks in the ICU at the height of the pandemic.  Indeed, Stanley is personally immunocompromised but chose to work with COVID patients—despite being given the option by his supervisor to avoid them—because he was so committed to patient care.

Once confronted by law enforcement on October 25, 2022, when the FBI came to his home and seized his phone—*i.e.,* before Stanley was charged with any crime—Stanley promptly directed counsel to explore the possibility of cooperation, instructing counsel to provide a detailed attorney proffer of his crimes in the hopes of obtaining a non-prosecution agreement that would afford him the ability to keep his medical license.

Seven months passed after the proffer without any response from the Government to this ordinary request.  Had Stanley been advised of the Government's decision on his application—as is the Government's usual practice—he would have immediately sought a pre-Indictment resolution to the case, be it cooperation, a deferred prosecution, or a guilty plea to an Information: anything to take responsibility as quickly as possible and, among other things, increase the likelihood of keeping his medical license.

Instead, on June 29, 2023, Stanley was arrested on a day of sensational publicity for the U.S. Attorney's Office, where multiple insider trading conspiracies were charged—one involving an individual connected to former President Donald J. Trump.

Now indicted (his application for a non-prosecution agreement evidently denied) and named in a press release of particular public interest, Stanley was suspended from work—though he was the sole breadwinner in a family of four children.  He sought to proffer to the

Government in the hopes of pleading guilty pursuant to a cooperation agreement, but was told that—although there were no concerns about his truthfulness—he could not provide substantial assistance under Section 5K1.1.  Stanley then applied for a deferred prosecution, again admitting his crimes to the Government in order to preserve his livelihood, but was denied.  Stanley promptly pled guilty and began to pay forfeiture prior to sentencing—approximately $21,500 as of today's date.  He also entered into a voluntary settlement with the Securities and Exchange Commission, which had brought a parallel action against him.  All of these actions demonstrate Stanley's deep remorse and acceptance of responsibility.

As Stanley's life and the letters from his friends, family, and colleagues reflect, Stanley is a person of great character and respect for the law whose crime was an aberration committed over the course of two unprecedently horrific weeks.  Stanley's crimes cost him his job and reputation, and have therefore kept him from helping his patients and supporting his family: Stanley's most important priorities.  Under the circumstances, including his deep acceptance of responsibility, there is no reasonable need for specific deterrence and, as further detailed below, there can be no dispute that Stanley's history and characteristics are uniformly positive, especially his commitment to help others.

Most important, he has been punished enough to achieve the important goal of general deterrence.  In addition to Stanley losing his hospital job of seven years treating critically ill patients, his ability to practice medicine altogether now hangs in the balance as state regulators, in response to his conviction, launch enforcement actions against his medical licenses.[1] Nevertheless, Stanley has worked tirelessly since losing his job to obtain alternative employment and has finally succeeded:  He has been offered two jobs: (1) a job in Florida working with critical patients on the conditions that he is not sentenced to prison and convinces the state board that he should keep his license; and (2) a position in Arizona—which would begin in late 2024 if he is at

---

[1] Stanley is licensed to practice in several states, including NY, WI, MS, MO, NV, TX, VA, TN, FL, LA, OK, and SC in order to practice telemedicine, which he did on top of his job as an ICU physician in order to assist patients in rural areas who could not access a doctor in person.  Stanley's telemedicine contract was terminated in November 2023 as a result of his crimes.

liberty—where he will have the opportunity to work in an underserved community primarily populated by veterans and retirees.[2]  Should Stanley have the opportunity to take either job, he would be able to continue to pay restitution, meaningfully contribute to society, and live the law-abiding life he always has—with the major exception of those two weeks when the pandemic was at its zenith and Stanley, as a strained and exhausted front-line healthcare worker, was managing the daily horrors of the ICU as well as fears for his own health and his family's welfare should Stanley contract and succumb to infection as so many healthcare providers did.  To be sure, as Stanley will attest, the crime he committed during those two weeks was extremely serious.  However, a term of imprisonment is not only contrary to Stanley's interests, but also to justice and to society, which, on balance, need Stanley more as a doctor and a father than a prisoner.

## II.   FACTUAL BACKGROUND

### A.    Personal History

Stanley was born in 1978 in the Byelorussian Soviet Socialist Republic, later known as Belarus, which was under Soviet control for most of Stanley's childhood.  Life there was difficult for Stanley's family, as the nation suffered unceasing economic crises, and dissidents of Soviet ideology faced physical and social repression.  In 1993, at the age of 15, Stanley made the courageous decision to flee Belarus with his family and seek refuge in the United States, where he was later granted asylum.  Stanley is particularly ashamed of breaking the laws of the country that saved his life.

Despite his challenging start, through hard work and determination, Stanley achieved professional success.  After relocating to the United States, Stanley excelled in his primary education, and attended college at what is currently called Pace University in New York City.  This is where Stanley first recognized his passion for medicine, ultimately attending St. George's University School of Medicine.  After receiving his medical degree, Stanley completed

---

[2] This job offer is more tenuous, as Stanley is not currently licensed to practice medicine in Arizona and would be applying for the first time as a felon; it is highly uncertain that he would be able to complete this process by the end of 2024.

a residency in Internal Medicine at the NYU Long Island School of Medicine and the rigorous Pulmonary Disease and Critical Care Fellowship at Mount Sinai.

Stanley is board certified in critical care medicine, internal medicine, and pulmonary disease, and initially worked in private practice.  He has been described by his own counselor as a "healer[,] through and through."  (Exhibit A, Letter from Mariya Martynenko, at ¶ 3. ("Martynenko Ltr.").)   In 2016, Stanley accepted a position at Vassar Brothers Medical Center ("Vassar"), where he remained employed until his suspension on July 10, 2023.  Specialists like Stanley are known as "intensivists," caring for critically-ill patients, typically in the ICU.  On top of his responsibilities at Vassar, Stanley treats, through telehealth services, hundreds of patients a year who suffer from diseases such as COPD and emphysema and seek telemedicine because, among other reasons, they live in rural areas where physicians with Stanley's specialties are unavailable.  Dr. Timothy P. Collins, Division Chief – Pulmonary/Critical Care/Sleep Medicine at Vassar, describes Stanley as a model doctor and an important contributor to his former hospital. (Exhibit B, Letter dated December 20, 2023, from Dr. Timothy Collins, et al., at ¶ 2 ("Collins Ltr.").) ("[Stanley] has always followed the rules.  He has a spotless record here at our hospital and in our community.  Furthermore, he has always gone above and beyond in caring for the sick his patients in our community and our intensive care unit at Vassar Brothers Medical Center.") Stanley also acts as a mentor to young physicians, including Dr. Jane Ehret, Chief Resident of the Internal Medicine Residency program at Vassar, and approaches that role with a "sincere dedication to the well-being and development of his mentees. . . ." (Exhibit C, Letter dated October 24, 2023, from Jane Ehret, MD at ¶ 6 ("Ehret Ltr.").) ("Dr. Stanley Kaplan's mentorship has played a pivotal role in shaping my medical career.  His unwavering commitment to patient care, passion for research, and sincere dedication to the well-being and development of his mentees make him an exemplary human being, who I am grateful to know.")  He is an excellent and committed doctor who dedicated his life's work to some of the sickest and neediest patients, even though many other specialties would have been much more lucrative.  See (Ehret Ltr. ¶ 2) ("[f]rom the moment I

stepped into the ICU, it was evident that [Stanley's] dedication to patient care and medical excellence were outstanding.")[3]

At the time he committed the crimes in the Indictment, Stanley's life and practice were fully dedicated to fighting the COVID-19 pandemic, which was in its first, worst months. Stanley was tasked with treating critical COVID patients not only at Vassar, but also at hospitals in the Bronx and Kingston, New York. Stanley suffers from an autoimmune disease requiring medication that weakens his immune system so much that he was offered the opportunity to avoid COVID patients. As Stanley's former supervisor confirms, Stanley denied this opportunity and put his patients first, working 12-hour shifts throughout the pandemic to help those stricken with the disease. (Collins Ltr. ¶ 3.) ("During the COVID-19 pandemic, Stanley was given the option of working with less sick/infectious patients because he has an underlying autoimmune disorder causing immunosuppression. Stanley refused. He came to work every day and took care of the sickest patients in the hospital understanding the risk of severe injury/harm during a very difficult time for the entire group.")

As the Court is aware, New York City was by far the most affected region in the United States. Between March and May 2020, more than 30,000 New Yorkers lost their lives to the virus. On the front lines of this fight were our community's first responders and front-line health workers, including Stanley. At times, hospitals—including Vassar—were overwhelmed with deceased bodies, and a nationwide shortage of ventilators and critical care physicians meant treatment options were limited for the constant flow of virus-stricken patients. But Stanley's commitment to treating his patients never wavered, even when it meant working overtime, nights, and weekends. It was at this time that Stanley committed his crime. To be sure, he did so to get money to which he had no right and knowing what he did was unlawful. But he also was under unprecedented stress and fear for his own life and for his family's wellbeing should he, himself,

---

[3] It is notable that many of the letters submitted on Stanley's behalf acknowledge and accept the extreme seriousness of his crime, but believe it is outweighed by his good qualities and contributions to society. This is not a situation where Stanley's supporters fail to grasp the severity of the crime and simply focus on mitigating factors. Stanley was honest with everyone in his life, including those who wrote letters on his behalf, about the crimes he committed.

contract and succumb to the virus.  This is no excuse for the crimes, but helps explain why he committed them and why there is no chance he would commit any crime again.

Outside of his practice, Stanley is a loving husband and devoted father.  Stanley and his current wife have three children ages 6, 4, and 2; Stanley is their sole financial support.  In addition, Stanley has a fourth child from a previous marriage of whom he has joint custody and supports financially.

### B.    The Offense Conduct[4]

From April 15, 2020, through May 4, 2020, Stanley purchased both stock and call options in Portola Pharmaceuticals, Inc. ("Portola"), based on material, nonpublic information that he had received from co-defendant Shawn Cronin.  (PSR ¶ 19.)  After Mr. Cronin tipped Stanley about the Portola buyout, Stanley discussed the inside information and the stock with other individuals, including a family member, and a work colleague and friend, co-defendant Dr. Paul Feldman.  (PSR ¶ 20.)

Based on the inside information given to him by Mr. Cronin, Stanley unlawfully bought Portola stock and call options nine times in late April and early May 2020.  The Portola buyout was announced on May 5, 2020.  (PSR ¶ 25.)  Stanley subsequently sold off his Portola options and stock on May 5th and May 6th.  (*Id.*)  In total, Stanley realized around $472,000 in profits.  (*Id.*)  The whole conspiracy, collectively, made approximately $2 million in ill-gotten gains.  (*Id.*)

### C.    Repeated Efforts to Cooperate and Guilty Plea

On October 25, 2022, the FBI visited Stanley's home and executed a search warrant for his phone.  Upon learning about the investigation, Stanley immediately accepted responsibility and cooperated with the authorities.  To this end, Stanley answered all questions asked of him that day by the FBI, and engaged us to begin discussions with the government immediately about cooperating pursuant to a non-prosecution agreement.

---

[4] *See also* Presentence Investigation Report ("PSR").

The attorney proffer took place on November 23, 2022. During the proffer, we disclosed every fact Stanley knew about himself and others. We spoke in as much detail as possible, including providing information relevant to the consideration of a non-prosecution agreement—such as Stanley's work in the ICU and hope to avoid losing his medical license—without minimizing his role in the crime as a tippee and tipper who reaped a significant profit from his repeated insider trading.

As stated above, we never heard back from the government, as would be typical in these situations. Instead, on June 29, 2023, Stanley was arrested and publicly named not only in an Indictment, but in a press release along with individuals charged in multiple other conspiracies—including an individual related to former President Donald J. Trump. The publicity surrounding Stanley's case was therefore much more significant—and humiliating—than it would have been had the U.S. Attorney issued a separate press release for Stanley's case (or, more likely, none at all, given that this is a mine-run insider trading case for this District).

After his indictment, Stanley sought to proffer in the hopes of pleading guilty pursuant to a cooperation agreement. Though the government did not dispute Stanley's honesty, we were advised that he did not have the information needed to rise to the level of substantial assistance. In another effort to formally accept responsibility, Stanley then applied for a deferred prosecution agreement, again admitting all of his crimes and expressing great remorse. That application was denied. Stanley promptly agreed to plead guilty to securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2. Stanley further consented to a Forfeiture Order pursuant to which he consented to the entry of a money judgment for $472,053.61. On September 19, 2023, Stanley pled guilty before Your Honor. In his allocution, Stanley accepted full responsibility for his conduct as described herein and in the PSR.

### D.      Post-Arrest Efforts to Obtain a Job

Despite being terminated from his former position at Vassar, Stanley has remained devoted to the treatment of critically-ill patients.  Stanley is also committed to paying the remaining forfeiture quickly, but to do that, he must work.  Accordingly, rather than sitting idle, Stanley has searched for new employment.  Stanley signed a contract for a temporary clinical assignment at a hospital in South Carolina.  This assignment will end right before sentencing.  And, as discussed, Stanley recently accepted a hospitalist position in Florida that is supposed to begin in February 2024 on the condition that he receive no prison time.  Stanley has also been offered a pulmonary critical care hospitalist position in an underserved community in Arizona.  This particular community has a large veteran and retiree population, and it has lacked a pulmonologist for over two years.  Stanley has contracted to start this job in August 2024 if he obtains a license to practice medicine in Arizona as a convicted felon.

### E.      The Guidelines Calculation

Stanley, the Government, and the Probation Office agree that the applicable Guidelines offense level is 19.  This offense level includes a two-level reduction pursuant to §3E1.1(a) and a one-level reduction per §3E1.1(b) because of Stanley's acceptance of responsibility and timely plea.  The offense level includes a further two-level reduction in accordance with the new Section 4C1.1 of the November 2023 version of the Sentencing Guidelines.  Based on the offense level of 19 and zero criminal history, the Guidelines provide for an imprisonment range of 30 months to 37 months.  The Probation Office recommends a below-Guidelines sentence of 18 months.  However, for the reasons discussed herein, a sentence of probation is more than sufficient to satisfy the statutory sentencing factors.

## III.    A SENTENCE OF PROBATION IS WARRANTED UNDER SECTION 3553(A)

Analysis of the statutory sentencing factors demonstrates that a sentence of probation is lawful, just, and appropriate under the unique circumstances of Stanley's case.

A.      **The Seriousness of the Offense and the Need to Provide Just Punishment**

Insider trading is a very serious crime that hurts investors and threatens confidence in the stock market.  Here, Stanley illegally traded nine times in April and May 2020, yielding profits to himself of approximately $472,000—a significant sum of money.  He did so in conspiracy with others—in a chain where Stanley acted both as tippee and tipper—that collectively led to unlawful profits of over $2 million.  Stanley does not, and cannot, minimize the severity of his criminal conduct.

But Stanley committed this crime during a once-in-a-lifetime period of stress, fear, exhaustion, and extraordinarily bad judgment.  To be sure, there were thousands of first responders who did not commit any crimes, and Stanley has no excuse.  But the unique circumstances of Stanley's offense still provide important context.  REDACTED , *see* PSR ¶ 67, it is widely known and accepted that COVID first responders suffered psychologically.  As stated by Dr. Collins, "The pandemic was a difficult time for physicians such as my group who specialize in pulmonary disease and critical care medicine.  We experienced burnout and mental anguish under very high stress circumstances." (Collins Ltr. ¶ 3.)  At the time he committed his crime, Stanley was working 80-hour weeks at three hospitals in the New York City area.  Because of the overcrowding of morgues, Stanley recalls being surrounded by corpses for days on end.  Being immunocompromised but refusing to abandon his COVID patients, Stanley constantly worried that he would become infected with the virus and die.  For more than a year, Stanley had trouble eating and sleeping, and he was quarantined from his family for weeks at a time.  It was in the middle of this crisis that Stanley committed his crime.

With respect to just punishment, Stanley—previously considered a beacon of good character—has already appropriately suffered the shame of being a convicted felon in the face of society, his family, his colleagues, and his friends, and he lost his job.  Perhaps more severe are the likely collateral consequences for his potential to practice medicine altogether.  State regulators are awaiting his sentencing.  Because the severity of a licensing board's sanction often reflects the

harshness of the criminal sentence, whether he salvages his ability to practice medicine in any state, depends in no small part on whether he goes to prison—as does his ability to keep the job he has now been offered in Florida. Stanley's new employer in Florida has informed him that the job is contingent on his receiving a non-custodial sentence (and, of course, convincing the medical board there that he should maintain his license). Similarly, licensing officials from the state of Louisiana have already informed Stanley that a prison sentence will result in, at least, lengthy suspension, whereas a non-custodial sentence will warrant a lesser disciplinary action. Likewise, a licensing lawyer in Texas has explained to Stanley that though his license will almost certainly be revoked upon conviction, he can apply for reinstatement with a good degree of certainty if he is not sentenced to prison.

Stanley's inability to practice medicine will also harm innocent patients. Through his in-person and telehealth practices, Stanley has treated hundreds of patients a year suffering from severe respiratory illnesses. The United States has a severe shortage of physicians—in particular, critical care doctors, and pulmonologists.[5] Pulmonologists are in high demand because of the aging population and frequency of respiratory diseases, and critical care staffing was a major concern during the COVID-19 pandemic. A study published by the National Institute of Health suggests that at the beginning of the pandemic, 48% of hospitals reported shortages in critical care providers.[6] Because of pandemic induced burnout and illness, this shortage has increased even further post-pandemic.[7] As stated by Dr. Timothy Collins, Stanley's former supervisor, Stanley's crime has "impacted his ability to practice medicine in a time when we are in need of pulmonary and critical care physicians." (Collins Ltr. ¶ 4.) Stanley has also devoted a significant amount of time to furthering research in the field of pulmonology and critical care. (Ehret Ltr. ¶ 4.) ("Dr. Kaplan's approach to research was as meticulous as his patient care . . . [h]is expertise and guidance were invaluable, providing me with a deeper understanding of clinical research methodologies and

---

[5] Elizabeth Beasley, *9 Things to Know About the Pulmonologist Shortage*, Healthgrades for Professionals (June 20, 2023) https://www.healthgrades.com/pro/9-things-to-know-about-the-pulmonologist-shortage.
[6] Neal F. Chaisson, *Are Critical Care Fellowship Programs Addressing the ICU Physician Shortage?*, 4 ATS Scholar 1, 1–3 (2023).
[7] *Id.*

scientific inquiry.")  Stanley's inability to practice and research will exacerbate this nationwide dearth of doctors with his specialization.

If Stanley's crimes harm his patients, that is his fault alone.  But that does not mean that this Court cannot take these collateral consequences into account.  *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509–11 (S.D.N.Y. 2006) (imposing a more lenient sentence on a corporate executive convicted of, *inter alia*, securities fraud, rejecting "arithmetic approach" to sentencing in favor of considering the § 3553(a) factors and collateral consequences of a lengthier sentence), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (stating that the collateral effects suffered by a defendant are a proper consideration under § 3553(a) to determine a "just punishment for the offense"); *United States v. Overton*, 573 F.3d 679, 690 (9th Cir. 2009) (discussing collateral consequences generally); *United States v. Jackson*, 523 F.3d 234, 238 (3d Cir. 2008) (same).  The harsh consequences to Stanley's patients and profession therefore also favor a sentence of probation.

Indeed, the consequences Stanley faces—including from medical boards and potential future employers—are more than sufficient to provide just punishment.  And as the Court is aware, there are several ways to make a probationary sentence more significant, such as by imposing a curfew enforced by electronic monitoring, a condition of community service, or any other condition deemed fit in the Court's discretion.

**B.**     **The History and Characteristics of the Defendant**

Though coming from humble beginnings living in Soviet Belarus, Stanley was granted asylum in the United States and has achieved personal and professional success.  After excelling in his educational pursuits, Stanley chose a medical specialty that is not particularly glorious or lucrative, but which makes an enormous impact on the community, as demonstrated during the pandemic.  Moreover, Stanley is a loving husband and devoted father to 4 children whom he supported financially prior to his arrest.  It has caused Stanley great pain to know that

his conduct has put livelihood at risk, which will result in extreme financial challenges for his family, for whom he is the only support.

Stanley's longtime friend, Steven Golub, shares his sentiments on Stanley's commitment to his family, stating:

> Stanley is a devoted husband to his wife Sasha, an exemplary father to his four children, Gabby, Ben, Nick, and Josh and a godfather to my son Marc. I have observed numerous times how amazing he is with kids. Stanley is patient, generous and full of trivia and humor that he's quick to share to extract smiles. It is hard to find someone more parental and loving. Stanley is also a loving son who cares for and supports his elderly mom and dad. . . . The Stanley I know chooses family over anything else.

(Exhibit D, Letter dated November 27, 2023, from Steven Golub at ¶ 2–3 ("Golub Ltr.").)

Stanley's neighbor, Allie Elpenord, too shared her experience with Stanley and his family.  Allie writes:

> Throughout our friendship, Stanley has consistently displayed traits of respect, kindness, reliability, and a strong work ethic. On his days off, he devotes time to picking up his kids from school and taking them to their after-school activities. He even extends the offer to take my son to his after-school activities. When our families spend time together, Stanley is usually cradling my 10-month-old daughter lovingly while engaging in conversations with my husband and me. He has earned the affectionate title of "Uncle Stan" from my children, and I trust him implicitly with their care.

(Exhibit E, Letter dated December 12, 2023, from Allie Elpenord at ¶ 2 ("Elpenord Ltr.").)

Stanley's selfless nature extends beyond his family.  Throughout his life, Stanley has been a devoted friend and colleague.

> - "I believe Dr. Kaplan is not only a good doctor, one I would trust if he were treating me, but also committed to the higher ideals of the medical profession: service to others, compassion, and a firm focus on the needs of the patient and family in front of him. He served with courage and dedication in the pandemic, and yet even in the most stressful circumstances retained his empathetic demeanor towards patients, their families, and his colleagues. I believe he has much to offer as a physician and health educator."  (Exhibit F, Letter dated November 10, 2023, from Rabbi Neal J. Loevinger at ¶ 2 ("Loevinger Ltr.").)

- Beyond his dedication to medicine and research, Dr. Kaplan's sincere and approachable nature left a lasting impression on me. Despite his busy schedule, he always made time to listen to my ideas, concerns, and aspirations, offering guidance and support to help me grow professionally. Dr. Stanley Kaplan's mentorship has played a pivotal role in shaping my medical career. His unwavering commitment to patient care, passion for research, and sincere dedication to the well-being and development of his mentees make him an exemplary human being, who I am grateful to know." (Ehret Ltr. ¶ 5–6.)

- "Stanley is an attentive and loving father. He is a supportive husband. He goes out of his way to help others. . . . He has continued to show how deeply he cares for the wellbeing of his patients. He has expedited seeing sick patients, reassured concerned patients and communicated closely with me regarding their care. . . . Stanley is a wonderful person, physician, and friend." (Exhibit G, Letter dated November 12, 2023, from Erin Penn at ¶ 3–5 ("Penn Ltr.").)

- "During our time working side by side, I witnessed Dr. Kaplan's dedication to his patients, his commitment to medical ethics and his contributions to our medical community. He has consistently demonstrated a high level of professionalism, competence, and compassion in his medical practice." (Exhibit I, Letter dated December 14, 2023, from David Kung at ¶ 2 ("Kung Ltr.").)

These letters underscore Stanley's loyalty and commitment to his family and friends.

As stated above, Stanley has accepted full responsibility for his crimes. As a show of remorse, Stanley immediately took responsibility for his actions, and attempted to assist the Government in their investigation. As evident in the following excerpts from the letters submitted to the Court, Stanley's remorse is apparent to his friends and family:

- "Despite the fact that he was under tremendous stress in the early days of the pandemic, being on the leading edge of the Covid-19 response, dealing with tremendous uncertainty as well as the added stress of not seeing his young children for weeks at the time, He has exhibited tremendous remorse about his criminal actions, and has accepted full responsibility for his conduct without making any excuses. REDACTED ██████████████████████████████████ (Martynenko Ltr. ¶ 4.)

- "Despite the recent surprise of his indictment, I firmly believe that it was a regrettable mistake that should not define Stanley's character. He has openly expressed remorse and is actively working to demonstrate that this incident is not an accurate representation of who he is. Witnessing Stanley's genuine love for his family, I can attest to the

heartbreak he feels over the situation. I hope this letter provides insight into the loving father, faithful husband, and considerate friend that Stanley truly is." (Elpenord Ltr. ¶ 3–4.)

- "Stanley Kaplan spoke to my students on October 30, 2023, via WebEx. He fit the profile of individuals I want my students to learn from. He was well spoken, clearly described the actions that led to the inditement [sic], and accepted responsibility for his actions. I recognize how difficult it is for individuals to openly share the details of their crimes, and I commend Stanley for his courage and willingness to impart his story to us." (Exhibit I, Letter dated November 21, 2023, from Dr. J. Mike Truelson at ¶ 3 ("Truelson Ltr.").)

- "When I discussed it with him after his arrest, he told me that he is not looking for excuses. He is taking responsibility for his actions and is facing the consequences. Although it has been painful to watch his angst, I am proud of my son for taking responsibility and refuting those in our extended family and friends circle who tried to minimize the gravity of his actions. I know that this experience has been difficult, but I am proud of my son for seeking psychological help, accepting responsibility, continuing to work and seek additional employment to help pay the penalties and his debt to the government." (Exhibit J, Letter dated December 18, 2023, from Victoria Kaplan at ¶ 5 ("Kaplan Ltr.").)

- "Dr. Kaplan has faced significant personal and professional consequences including being terminated from his position at Vassar Brothers Medical Center . . . . I believe that the impact of his actions on his family and his ability to provide for them has weighed heavily on Dr. Kaplan's conscience. He has expressed a deep sense of regret and understands the severity of the consequences he faces. I am hopeful that, through counseling and continued reflection, he will take meaningful steps toward personal growth and redemption." (Kung Ltr. ¶ 4.)

- "After his arrest Stanley had immediately taken responsibility for his actions in opposition to those in our families who have tried to minimize the seriousness of his actions. Although his children are too young to understand it, with time they will learn of his conduct after his arrest and I am confident will be proud of their father for righting the wrong he had caused." (Silva Ltr. ¶ 5.)

REDACTED

-14-

REDACTED

### C.      The Interests of Specific and General Deterrence

It is beyond dispute that the interest of specific deterrence is already met.  Stanley's crimes were a shameful aberration from an otherwise law-abiding life where he contributed meaningfully to society and has supportive family and friends.  Combined with his efforts to cooperate, to plead guilty as soon as possible, and to begin paying forfeiture prior to sentencing, it is clear that Stanley will not commit a crime again.

Imposing a sentence of probation would also meet the goal of general deterrence. Stanley's widely publicized arrest has already sent a strong message to other professionals that no one—no matter their education, job, or status in society—can escape prosecution.  As discussed above, on top of the shame caused by the press coverage in this case, Stanley has already experienced multiple punishments that would deter future criminals, including the shame of losing his job at Vassar and jeopardizing his ability to practice medicine, to include the real risk of permanently losing his medical license and, thereby, his ability to support his family.  Moreover, Stanley has already taken the opportunity to speak to future professionals in order to prevent others from following his path: admitting his crime in a group setting and describing the consequences, (Truelson Ltr. ¶ 3) and searching for opportunities to tell his story to others.  The only conclusion the public can take away from Stanley's case is that insider trading will be prosecuted against all members of society to the fullest extent of the law, and that such prosecutions—no matter the ultimate sentence—have dire consequences.

## IV.      CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a sentence of probation.

Respectfully submitted,

Rachel Maimin
Rachel Maimin

Logan Vickery
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
212.262.6700
*Attorneys for Defendant Stanley Kaplan*

December 22, 2023

# EXHIBIT A



The Honorable Gregory H. Woods
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007

Regarding: US v Stanley Kaplan 23 Cr. 320 (GHW)

Dear Judge Woods

My name is Mariya Martynenko. I am a Licensed Professional Counselor (NJ License # 37PC00315800)



*Outpatient Mental Health Services*

**FLORIDA**
2033 Wood St., Ste 220, Sarasota, FL 34237
P. 941.677.3366  F. 941.677.3367

**NEW JERSEY**
795 Main St., Hackensack, NJ 07601
P. 201.488.5161  F. 201.488.5162

*Family Owned & Operated Since 2003*
REVITALIZINGPSYCHIATRY.COM



**REDACTED**

**REDACTED**

I hope this helps your Honor in rendering your sentencing decision.

Please do not hesitate to contact me should you have any questions.

Sincerely,

Mariya Martynenko (NJ License # 37PC00315800)

Outpatient Mental Health Services

**FLORIDA**
2033 Wood St., Ste 220, Sarasota, FL 34237
P. 941.677.3366 F. 941.677.3367

**NEW JERSEY**
795 Main St., Hackensack, NJ 07601
P. 201.488.5161 F. 201.488.5162

Family Owned & Operated Since 2003

REVITALIZINGPSYCHIATRY.COM

# EXHIBIT B


Nuvance
Health.

Nuvance Health
Division of Pulmonary/Critical
Care and Sleep Medicine
21 Reade Place, Suite 1000
Poughkeepsie, NY 12601
Tel: 845-214-1880
Fax: 845-214-1885

Dear Judge Woods,

I am pleased to write this composite letter from my group of physicians in attestation of Dr. Stanley Kaplan's character. My group consists of 14 physicians, all of whom agree with this attestation and are named: Steven Ritter, MD, Hary Suseelan, MD, Richard Merrill, DO, Elyana Matayeva, DO, Fairouz Hasselmark, MD, Samar Khan, DO, Matthew Apedo, MD, Shazia Choudry, MD, Pang Lam, MD, Brett Erdreich, MD, Nicholas Stickel, MD.

I have personally worked with Stanley side-by-side since 2014. He has always followed the rules. He has a spotless record here at our hospital and in our community. Furthermore, he has always gone above and beyond in caring for the sick his patients in our community and our intensive care unit at Vassar Brothers Medical Center.

During the COVID-19 pandemic, Stanley was given the option of working with less sick/infectious patients because he has an underlying autoimmune disorder causing immunosuppression. Stanley refused. He came to work every day and took care of the sickest patients in the hospital understanding the risk of severe injury/harm during a very difficult time for the entire group. The pandemic was a difficult time for physicians such as my group who specialize in pulmonary disease and critical care medicine. We experienced burnout and mental anguish under very high stress circumstances. Stanley not only took this head on, but also continued to mentor medical students and residents as they prepared for their careers in medicine.

Stanley had a rare lapse in judgment in 2021 and this has affected him deeply. Unfortunately, it has also impacted his ability to practice medicine in a time when we are in need of pulmonary and critical care physicians. Thankfully, he is currently working Per diem at a hospital in Florida and is able to continue contributing to our profession in some regard.

I speak for my entire group when I say that Stanley has learned a most difficult and valuable lesson. We would re hire him tomorrow if we were able.

Please feel free to reach out with any questions or concerns.

Sincerely,

Timothy P. Collins, DO, FCCP
Division Chief, Pulmonary/Critical Care/Sleep Medicine
ICU Medical Director, VBMC
Pulmonary/Critical Care Fellowship Director
Adult Cystic Fibrosis Program Director
Vassar Brothers Medical Center of Nuvance Health
Poughkeepsie, New York

# EXHIBIT C

Character Statement for Dr. Stanley Kaplan                                    October 24, 2023

Jane Ehret, MD
REDACTED

Hon. Gregory H. Woods
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St
New York, NY 10007-1312

Dear Judge Woods,

I, Dr. Jane Ehret, currently serve as the Chief Resident of the Internal Medicine Residency program at Vassar Brothers Medical Center. I am writing this letter to express my utmost admiration and respect for Dr. Stanley Kaplan, an exceptional pulmonary and critical care attending physician. It's my honor to attest to the sincerity and brilliance that Dr. Kaplan exudes as a person and as a mentor.

Dr. Kaplan's impact on my medical career has been immeasurable, as he inspired me to want to pursue a pulmonary and critical care fellowship. From the moment I stepped into the intensive care unit, it was evident that his dedication to patient care and medical excellence were outstanding. Dr. Kaplan was one of the first intensivists I had the privilege of working with since beginning my residency on July 1, 2021.

As an attending physician, he not only demonstrated exceptional medical knowledge and technical skill, but he also invested time and effort in guiding and teaching young residents like me. During my time working under Dr. Kaplan's mentorship, he not only supported my clinical development but also recognized my enthusiasm for medical research. Recognizing my interest, he graciously extended an invitation to collaborate with him on designing a research project focused on improving patient outcomes in the intensive care unit. I was elated by the opportunity to work alongside such an esteemed physician and mentor.

Dr. Kaplan's approach to research was as meticulous as his patient care. He patiently guided me through the research process, from refining the research question to designing the study and gaining IRB approval. His expertise and guidance were invaluable, providing me with a deeper understanding of clinical research methodologies and scientific inquiry. He fostered an environment of intellectual curiosity and encouraged me to explore beyond the confines of our project, broadening my knowledge of the field and instilling in me a passion for advancing the field of pulmonary and critical care.

Beyond his dedication to medicine and research, Dr. Kaplan's sincere and approachable nature left a lasting impression on me. Despite his busy schedule, he always made time to listen to my ideas, concerns, and aspirations, offering guidance and support to help me grow professionally.

Dr. Stanley Kaplan's mentorship has played a pivotal role in shaping my medical career. His unwavering commitment to patient care, passion for research, and sincere dedication to the well-being and development of his mentees make him an exemplary human being, who I am grateful to know.

If you require any further information or clarification, please do not hesitate to contact me.

Sincerely,

Jane Ehret, MD

# EXHIBIT D

**STEVEN GOLUB**



November 27, 2023

Dear Judge Woods:

I am writing on behalf of my friend, Stanley Kaplan. Stanley and I have been friends for many years. The time we spent together gave me a chance to get to know him and his family. I would like to share my view of Stanley hoping it would help you better understand his character before making a decision that will effect the rest of his life.

Stanley is a devoted husband to his wife Sasha, an exemplary father to his four children, Gabby, Ben, Nick, and Josh and a godfather to my son Marc. I have observed numerous times how amazing he is with kids. Stanley is patient, generous and full of trivia and humor that he's quick to share to extract smiles. It is hard to find someone more parental and loving.

Stanley is also is a loving son who cares for and supports his elderly mom and dad. Same as I, Stanley was raised in family of working class immigrants who taught him the importance of family and hard work. He turned down much more lucrative jobs to stay close to his parents. The Stanley I know chooses family over anything else.

Stanley is a highly competent and dedicated physician whose work in ICU saved countless lives. He genuinely cares about well-being of his patients and constantly strives to improve standard of medical care in his community. He holds himself to the highest standard and demands excellence from those around him. Stanley chose medicine as his profession for the most noble reason - to do good. In addition to long hours at his hospital, Stanley also moonlights to serve remote and under-privileged communities that are in need of specialized medical care.

Even off duty Stanley never stops being a doctor. He always takes calls and rushes to help those in need. To make some examples, once during a flight to Puerto Rico, a flight attendant announced there is passenger on board who appears to be having a seizure. Stanley immediately stood up and volunteered to help. He examined the passenger, looked at his medications, provided aid that made him stable, and monitored him for the remainder of the flight. As a result of his actions, the sick passenger and his family were relieved and the plane didn't have to be turned back.

Another time while we were eating dinner at an outdoor cafe, a young boy was riding a bicycle along the sidewalk and fell. Without saying a word Stanley rushed towards the boy to see if he was hurt.

Another time, one of our friends got mis-diagnosed with type two diabetes and started taking wrong treatment. Stanley identified the error just by speaking with her and suggested she gets a second opinion immediately. He was right. Turned out she had a rare case of type one diabetes which could have been fatal if went on untreated. I can go on, but it is clear - for Stanley it's an instinct to help people.

I know Stanley as an honest and hard working man with strong morals. I would never describe him as opportunistic, or greedy, or money-hungry. It is still very difficult for me to believe he would ever intentionally commit a crime. It just doesn't make sense! What I do find believable is he relied on some bad advice that came from someone he trusted. In any case, he used poor judgement and what he did was undoubtedly wrong.

Stanley is a good man. A good man is not someone who never makes mistakes. In my view, a true test of character is the ability to admit mistakes and willingness to make things right. When faced with allegations of wrongdoing, Stanley did just that by showing unconditional cooperation with authorities and was quick to admit his mistakes. He is the type of man who makes things right.

The past six months have been extremely tormenting for Stanley. The embarrassment he suffered from being arrested in front of his wife and children and escorted out of his house in handcuffs is hard to imagine. Then having to face parents, neighbors, relatives, friends, and co-workers and admit to his charges was a tremendous blow to his honor, and possibly the greatest punishment for a man like Stanley who worked so hard for everything in his life. I am certain that he learned from this mistake. This experience makes Stanley, out of all people, the least likely to every do this again.

I implore you to show kindness towards my friend. Stanley belongs with his wife and young children. He belongs taking care of his elderly parents. He belongs in his hospital helping people. Please do not stop him from doing good.

I sincerely appreciate you taking the time to read this letter.  Please do not hesitate to reach out if you have any questions for me.

Kind Regards,


Steven Golub

# EXHIBIT E

REDACTED

December 12th, 2023

To Whom It May Concern:

My name is Allie Elpenord, and I am neighbors with Stanley Kaplan. We initially connected through his wife, Sasha Cole, and our families have since become close friends. Our bond has strengthened as our children share similar ages and interests.

Throughout our friendship, Stanley has consistently displayed traits of respect, kindness, reliability, and a strong work ethic. On his days off, he devotes time to picking up his kids from school and taking them to their after-school activities.  He even extends the offer to take my son to his after-school activities. When our families spend time together, Stanley is usually cradling my 10-month-old daughter lovingly while engaging in conversations with my husband and me. He has earned the affectionate title of "Uncle Stan" from my children, and I trust him implicitly with their care.

Despite the recent surprise of his indictment, I firmly believe that it was a regrettable mistake that should not define Stanley's character. He has openly expressed remorse and is actively working to demonstrate that this incident is not an accurate representation of who he is.

Witnessing Stanley's genuine love for his family, I can attest to the heartbreak he feels over the situation. I hope this letter provides insight into the loving father, faithful husband, and considerate friend that Stanley truly is.

Sincerely,

Allie Emelia Elpenord
Email: aelpenord@outlook.com
Phone: 845-559-3385

# EXHIBIT F

# RABBI NEAL JOSEPH LOEVINGER

REDACTED

11/10/2023


To the Honorable Gregory H. Woods :

I am a rabbi, hospital chaplain, and colleague of Dr. Stanley Kaplan. He and I have worked together since 2016, in his role as a physician in the Intensive Care Unit of Vassar Brothers Medical Center, and my role as a chaplain and coordinator of the hospital's Ethics Committee. Over the years, I have come to know Dr. Kaplan as a caring and thoughtful physician, who advocated for his patients, gave them the best care possible, and was never hesitant about asking for advice, either from his physician colleagues or the Ethics Committee. On several occasions over the years, Dr. Kaplan has brought difficult cases to the Ethics Committee, including instances when he could have handed off the problem to somebody else or chosen the easy route rather than sought what is best for his patient. Some doctors come to the Ethics Committee as a formality, but I believe Dr. Kaplan actually took our advice in good faith. At least once he came back to us after a few days when the patient's condition changed, seeking further input.

I believe Dr. Kaplan is not only a good doctor, one I would trust if he were treating me, but also committed to the higher ideals of the medical profession: service to others, compassion, and a firm focus on the needs of the patient and family in front of him. He served with courage and dedication in the pandemic, and yet even in the most stressful circumstances retained his empathetic demeanor towards patients, their families, and his colleagues. I believe he has much to offer as a physician and health educator. I hope that this perspective may be useful to you.

Sincerely,

Rabbi Neal J Loevinger

# EXHIBIT G



Date 12/12/23

The Honorable Gregory H. Woods
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007-1312

Dear Judge Woods,

I have known Stanley Kaplan for a little less than 3 years. I moved here from Cleveland, with my two children and husband and met his wife while we were both on a walk. In passing, I told her about a new diagnosis of a conduction abnormality in my heart that was noted on my EKG at my primary care office. I had recently gotten the Covid vaccine, and I was worried it could be related and scared something could happen while caring for my children. I did not have a cardiologist in the area, and it was going to take months to get an appointment which was distressing. Later that day, Stanley reached out to me and informed me that he had gotten me an appointment that week for an echocardiogram and soon after, with a local cardiologist. He showed genuine concern for my well-being, even having just met me. Later than week, I met him, in person, while out for a walk. He was, again, sympathetic and offered both advice and gave me his number in case I was worried and needed urgent medical advice.

Fortunately, the echocardiogram was normal, and the conduction abnormality resolved. However, his willingness to go out of his way to help me, meant so much to me, especially being new to the area and having to care for my two toddlers, while worried about my heart.

Since then, our families have been very close. We do play dates with the kids, celebrate holidays, have brunches and various outings together. Stanley is an attentive and loving father. He is a supportive husband. He goes out of his way to help others.

After being here for about 6 months, I started work at Vassar Brother Medical Center. We have shared several patients. He has continued to show how deeply he cares for the wellbeing of his patients. He has expedited seeing sick patients, reassured concerned patients and communicated closely with me regarding their care.

I was devastated, on a very personal level when I heard what had happened. I could never imagine, in a million years, that Stanley would intentionally break the law. It shook my sense of reality because Stanley is a wonderful person, physician and friend. I felt for his family, friends and the families of those impacted by this crime. The entirety of the situation is saddening.

I write this letter in the hopes that I can reflect the person Stanley is and continues to be, despite this error in judgment.

Sincerely,

Erin Penn

# EXHIBIT H

David Kung, M.D.
Pulmonary & Critical Care Medicine
REDACTED

December 14, 2023

The Honorable Gregory H. Woods
Daniel Patrick Moynihan United States Court House
500 Pearl Street
New York, NY 10007-1312

Re: Character Reference for Stanley Kaplan, M.D.

Dear Judge Woods:

I am writing this letter to offer my sincere character reference for Dr. Stanley Kaplan, who, as you know, is currently awaiting sentencing for his involvement in insider trading. While I am deeply disappointed by his moral lapse, I believe it is my responsibility to provide you with a comprehensive perspective on his character.

I have known Dr. Kaplan for 3 years in a professional and personal capacity, having worked together since the COVID pandemic at Vassar Brothers Medical Center in Poughkeepsie, NY. During our time working side by side, I witnessed Dr. Kaplan's dedication to his patients, his commitment to medical ethics and his contributions to our medical community. He has consistently demonstrated a high level of professionalism, competence, and compassion in his medical practice. Additionally we have become friends personally as we both have an enthusiasm for watching the financial markets, enjoy playing chess and going to the opera.

It is with great sadness that I acknowledge the gravity of the charges against Dr. Kaplan. His actions have severely tarnished his reputation and the trust placed in him by his colleagues, his patients and the community. However, I also want to bring to your attention that he expressed genuine remorse for his actions.

Dr. Kaplan has faced significant personal and professional consequences including being terminated from his position at Vassar Brothers Medical Center. He has been unable to work for several months, causing considerable financial strain on his family. I recently helped him secure temporary employment as a locums tenens physician over the Christmas and New Year holidays, demonstrating his commitment to providing for his family and rectifying his situation. I believe that the impact of his actions on his family and his ability to provide for them has weighed heavily on Dr. Kaplan's conscience. He has expressed a deep sense of regret and understands the severity of the consequences he faces. I am hopeful that, through counseling

and continued reflection, he will take meaningful steps toward personal growth and redemption.

While I do not condone his actions, I sincerely request that Your Honor considers the totality of Dr. Kaplan's character and the efforts he is making to rectify the situation. I believe he is genuinely remorseful and committed to rebuilding his life with integrity.

I appreciate your time and attention to this matter. If you require any further information or clarification, please do not hesitate to contact me.

Sincerely,

David Kung, M.D.
Pulmonary & Critical Care Medicine
Vassar Brothers Medical Center

# EXHIBIT I



**COLLEGE OF BUSINESS**
Richard C. Adkerson School of Accountancy

P.O. Box EF
Mississippi State, MS 39762

P. 662.325.3710
F. 662.325.1646
business.msstate.edu/accounting

Date: 11/21/2023

The Honorable Gregory H. Woods
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007-1312

Regarding: Stanley Kaplan

Since I began teaching the masters-level course Fraud Examination in Fall 2021, I have made it a priority to expose my students to individuals who have committed white-collar crimes. I have had the privilege to meet with several of these individuals who are actively sharing their story in the hopes of deterring others from making similar mistakes.

It has been my experience that most of these individuals do not fit the profile of a criminal, but rather are like my neighbors, colleagues, and friends. Since many of my students will begin their careers in accounting and finance, I believe it is important that they realize that "good" people are also capable of committing fraud.

Stanley Kaplan spoke to my students on October 30th, 2023, via WebEx. He fit the profile of individuals I want my students to learn from. He was well spoken, clearly described the actions that led to the inditement, and accepted responsibility for his actions. I recognize how difficult it is for individuals to openly share the details of their crimes, and I commend Stanley for his courage and willingness to impart his story to us.

Sincerely,

*J. Mike Truelson*

Dr. J. Mike Truelson, PhD, CPA (MS, TX)
Assistant Professor of Accountancy

# EXHIBIT J

The Honorable Gregory H. Woods
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007

Regarding: US v Stanley Kaplan 23 Cr. 320 (GHW)

Dear Judge Woods

My name is Victoria Kaplan, and I am Stanley Kaplan's mother. I am very sorry that my son
violated federal law. He made some terrible decisions, and he knows it. It saddens me that
Stanley, who has always had unconditional respect for the rule of law, had stepped out of his
character and committed this crime. Since Stanley's arrest I have witnessed Stanley's journey of
self-examination and repentance. Please accept this letter as my way of telling you more about
my beloved son.

Stanley is a kind and gentle person. He has a big heart and is always available to help. He is very
attentive to both myself and my husband. He has always treated us kindly and with respect.
Stanley comes from a good, hard working family. We have arrived in this country in 1993 when
Stanley was 15 years old. We came as refugees from the economically unstable Belarus of the
1990's and had very little. Stanley began working almost immediately upon our arrival
delivering circulars in Brooklyn and Queens on the weekends, while going to High School full
time. He then took a part time job at Home improvement store in Brooklyn where he worked
until he began his college education at Pace University in Manhattan. To save money, Stanley
lived at home and commuted to college, first from Brooklyn, and then from New Jersey where
we moved in 1997. He continued to have part time jobs even during his rigorous college
schedule.

Stanley always had very strong work ethic. He had always believed the old adage that any job
worth doing was worth doing well. He carried that from his jobs as laboratory technician at
Pace, to sales associate at Radio Shack, to laboratory technician at water testing facility, and
then after finishing Medical training, to residency, fellowship, and finally as an attending
physician. Stanley is a workaholic, however he always makes time for family, and not just his
children, but also extended family who often ask him for advice.

REDACTED
He was working in the front
lines of the pandemic after he took a temporary assignment at St Barnabas Hospital in the
Bronx where he witnessed firsthand the devastation caused by the corona virus. I remember
Stanley telling me a story of a young girl that was dying on the ventilator and his desperate
attempts to transfer her  to a tertiary care facility who would not accept her due to lack of ICU
beds. REDACTED

REDACTED . It is my firm believe that Stanley committed the crime of Insider Trading while under tremendous emotional and physical stress of working in the ICU during The early days of the pandemic. His actions were so out of character that I cannot help but think that if this criminal opportunity presented itself at any other time, Stanley would have done the right thing and never would have made these trades. I firmly believe that this criminal behavior was aberrational and will never happen again!

When I discussed it with him after his arrest, he told me that he is not looking for excuses. He is taking responsibility for his actions and is facing the consequences. Although it has been painful to watch his angst, I am proud of my son for taking responsibility and refuting those in our extended family and friends circle who tried to minimize the gravity of his actions. REDACTED

I believe that Stanley has learned from this devastating experience. I know that he would never commit another crime. He is sickened by what he did. I am proud of him for taking responsibility, but I humbly ask your honor for leniency. I know that Stanley will emerge from this process as a productive member of society, living peacefully, responsibly, and in service to others.

My husband and I love Stanley very much and hope you will have mercy on him.

Sincerely

Victoria Kaplan

# EXHIBIT K

Dear Judge Woods ,

This letter is purely written from my heart as I have never written a letter of Character for anyone.

I have known Stanley Kaplan for 9 years , as a son in law, husband, father and a professional in his field as a physician. Stanley has always been kind and respectful as our son in law, a devoted and caring husband to our daughter, loving and supportive father to his 4 children, and a tireless servant to the demanding needs of our people as a pulmonologist.

I have had the opportunity and privilege of knowing his parents, aunt and uncle, brother cousins, and  close friends, all who have enriched our lives over the years. Their family stories of immigration to the United States from Soviet Union and Belarus are both bone chilling and inspirational, as each and every one of them has taken the path of hard work, sacrifice, and devotion to making a better life in America.

Plain and simple, Stanley made a very bad decision getting involved with a few people he really did not know, a decision that has wreaked havoc on his entire family, morally, emotionally, and financially that will take him years to restore.

After his arrest Stanley had immediately taken responsibility for his actions in opposition to those in our families who have tried to minimize the seriousness of his actions. Although his children are too young to understand it, with time they will learn of his conduct after his arrest and I am confident will be proud of their father for righting the wrong he had caused.

At this time I am respectfully asking for compassion and understanding in your judgment. This man has a tremendous ability to contribute his God given talent to so many people in need , along with his most important responsibility to love and support his young family.

Sincerely,

Paul Silva

# EXHIBIT L

Samar Khan, D.O.

Associate Medical Director Critical Care Medicine

Pulmonary and Critical Care Medicine

REDACTED ███████

████████████

███████████████

█████████

December 18, 2023


Dear Judge Woods,

I am writing this character reference on behalf of my friend, Dr. Stanley Kaplan. I acknowledge that Dr. Kaplan has made mistakes, but I firmly believe that as a whole his true character is one of great integrity. It is without question that Dr. Kaplan not only recognizes the magnitude of this situation but is also determined to atone in any way possible. It would be an immense shame to reduce Dr. Kaplan down only to his faults, especially when these faults do not accurately represent him as a physician or as a man.

I first met Dr. Kaplan during our training years in the early 2000's. At that time, I was his senior and he quickly proved himself to be proficient, genuine, and dedicated. Many years later Dr. Kaplan became my partner at Vassar Brothers Medical Center and these admirable qualities have only amplified. As a physician, Dr. Kaplan has demonstrated a marvelous work ethic and immeasurable compassion for his patients. Given the nature of our job, trust and comradery between us colleagues are essential as our collaborative efforts can literally be the difference between life and death.

Dr. Kaplan has always been an essential member of our team, but I would like to highlight how vital his role was during the COVID pandemic. The challenges we faced during that time were indescribable. In the beginning, before we knew what we exactly were dealing with, we had to rely on each other's expertise to come up ways to treat our patients. Given how unprecedented the COVID pandemic was, it was truly an arduous time, both intellectually and emotionally. It was a time where we all leaned on each other in many ways and I am grateful to have had Dr. Kaplan as my colleague and as my friend during it.

Another testament to Dr. Kaplan's selfless and warm nature is how readily he will offer to help his friends. My son is a physician in the United States Army and last year he was deployed to Kosovo for 9 months. His deployment was a difficult time for myself and my husband, we were filled with worry and desperate to see our son. Roughly halfway into my son's deployment, he finally had a few days off. Without haste, Dr. Kaplan immediately offered to switch shifts with me so that I could visit my son. Those few days together meant so much to my family and I carry a deep appreciation for the thoughtfulness he showed me during that time. Dr. Kaplan shows this level of humanity to all he encounters.

Dr. Kaplan is a good man. I am disappointed with the decisions he made but that disappointment is outweighed by the certainty that he is filled with remorse and will never make the same mistakes again. I am confident that he will continue reflecting, growing, and living in a way that more

correctly mirrors his true character. I hope Your Honor considers my heartfelt endorsement of Dr. Kaplan.

I sincerely thank you for your time. If you have any questions or would like clarification, please feel free to reach out to me.


Warm regards,

Samar Khan, D.O.

Pulmonary & Critical Care Medicine

Vassar Brothers Medical Center

# EXHIBIT M

The Honorable Gregory H. Woods
Daniel Patrick Moynihan
United States Court House
500 Pearl St
New York, NY 10007-1312

Dear Judge Woods:

I am the wife of Stanley Kaplan. We met in 2014 while I was working as an ICU Registered Nurse at St. Luke's Hospital in New Bedford, Massachusetts. As a new nurse, I was quite intimidated by him because he had the reputation of being a brilliant physician. We grew to know each other by working alongside and collaborating with other team members to manage critically ill patients. Through these stressful and sometimes emergent situations, Stanley modeled the type of healthcare professional and individual I aspired to be. These characteristics include empathy, professionalism, respectfulness, communication, interpersonal skills, patience, integrity, critical thinking, and problem-solving. I mention these qualities because they are not only important in a healthcare professional but also as a member of society. What attracted me to Stanley was the fact that he was dedicated to his career, and family, abiding by all rules, and his positive outlook on life. I have never met a more law-abiding person than Stanley. He would be the first to point out if something was not followed to the T. I always wondered if he was affected in his childhood while living in the Soviet Union where times were tough but he and his family persevered. I think positivity is the key to living a content life. Never would I have imagined this catastrophic event in our lives would include my husband. His conduct was completely out of character for him.  His whole identity contradicts what has occurred and has completely affected the mental health of my family including our 3 young, innocent children who are petrified of the police and anyone dressed in black.

Your Honor, I do not identify Stanley as someone with moral turpitude. This deviation in behavior was during COVID-19 in which an overwhelming amount of people were dying while doctors were rendered helpless to help them. Patients flooding the ICU's and for the most part not surviving, must have impacted him in such an inexplicable way. Please empathize with the lack of control he experienced at home and work. The inability to save people due to the unknown (COVID-19) was overwhelming for everyone, including but not limited to ICU physicians.

To me, Stanley is a major contributor to society and his family. Because he has lost his job with Nuvance, the patients who saw him in the office are now unable to find a pulmonologist without waiting 3-6 months. I know this because I tried to find one for myself and was told the next available appointment was in 6 months. I kindly request you allow him to continue helping people who need medical attention because it is challenging to find specialists promptly. As for my reasons, my family will fall apart in his absence. We will lose our home and my children will once again be devastated by things they cannot understand except that their father has left them and that their living situation is unstable.

Stanley has been vocal in taking full responsibility for his actions. He is committed to returning to being a doctor and helping his patients. I humbly ask you to show mercy as you consider his punishment.

Sincerely

Sasha Cole

Please feel free to contact me at any time. My cell phone number is REDACTED ████████████████████████████████. Thank you for your time and consideration.

Sincerely,
Sasha Cole

# EXHIBIT N

Stanley Kaplan, MD
REDACTED

Dec 13, 2023

Hon. Gregory H. Woods
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

      Regarding:    United States v. Slava (Stanley) Kaplan (1:23-cr-00320)

Dear Judge Woods,

I write this letter to you and to all who stand in judgment of me in earnest acknowledgment of
the grave nature of my actions. I bear the total weight of responsibility for my criminal conduct,
which not only transgressed our nation's laws but also profoundly wounded the trust of my
beloved family—my parents, wife, and children. I was well aware of the ethical and legal
standards I should have upheld, yet I chose to tread a path of wrongdoing. In admitting my guilt
and taking responsibility for my actions, I take the first step towards reconciliation. Still, I am
acutely aware that this journey of atonement extends far beyond a mere guilty plea. Shame and
remorse consume me for the choices I made.

While I grapple with the gravity of my wrongdoing, I recognize that the path to redemption
begins with accepting the consequences of my actions. By pleading guilty and taking
responsibility, I have initiated the accountability process.

I understand I will meet with a probation officer for a presentence investigation before my
sentencing. I also recognize that you and the probation officer will have access to substantial
information from the prosecutor. With that information, I beg your discretion and compassion
when determining an appropriate sentence, and I implore you to consider the entirety of my life
when rendering judgment. While I stand guilty of criminal acts, I have also endeavored to lead a
life marked by societal contributions. When you weigh my case, I hope you will consider my
efforts to be both a responsible physician and a conscientious citizen. In essence, I request that
you, as judge, consider my criminal conduct alongside my potential for redemption and
reparation. I offer this letter to give this Court a more comprehensive understanding of my
character, the lessons I have gleaned from this ordeal and my commitment to making amends. I
shall commence by providing an overview of my background.

**Background:**

My father, Yefim Kaplan, and mother, Victoria, were born in the Soviet Union and were married in the area that is now the country of Belarus. I, too, entered this world in Belarus and was just thirteen when the Soviet Union collapsed. I recall that period as one marked by excitement and the challenges posed by the tumultuous transition to a market economy. My family is of Jewish heritage, and during those times, the specter of religious and ethnic persecution loomed large. Coupled with the economic uncertainty that followed the breakup of the USSR, these circumstances compelled my parents to seek opportunities in the United States. In 1993, two years after Belarus became independent, the United States granted our family immigration visas, and we embarked on our journey to live in the United States and become citizens.

Upon our arrival, we settled in Brooklyn, New York. Our family's financial struggle necessitated my swift entry into the workforce, and I began earning money to help my family by delivering circulars for a local supermarket. My mother pursued bookkeeping courses and then went on to work as a dedicated bookkeeper for a non-profit organization, a role she dutifully fulfilled for over three decades. My father, on the other hand, initially worked in a warehouse and toiled tirelessly until he could amass sufficient funds to purchase a vehicle for use in a private transportation service. My father continued to work as a limousine driver until his retirement last year. My parents' hard work and dedication to our family's welfare are a testament to the values of hard work and commitment instilled in me from an early age.

My high school years were difficult for me. I came to the United States without a strong background in English, and it was difficult to learn good study habits while the language was such a barrier. I took ESL classes, but achieving my potential took a lot of work and time.

Money was always a concern, especially in the early years after we arrived in the United States. I worked the entire time while going to high school, and our whole family lived in a one-bedroom apartment until after I had finished my first year of college. Even then, when my parents could afford a modest house, I lived with them all through my time at Pace University to conserve money. Although the commute was over forty minutes each way, living with my parents and commuting was much less expensive than moving out on my own.

I worked in the chemistry lab as well as in Radio Shack to help pay for my education, and graduated in 2000. As my English skills improved, so did my grades. At the end of college, I knew I wanted to be a medical doctor, but I also knew that my earlier grades would make admission to a medical program difficult. Despite this obstacle, I decided to give it a try. I took a year off from school to work and study for the MCAT exam.

That year, I had time to think about what I wanted to do with my life. I also asked myself "why" I desired to become a medical doctor. Ultimately, I found that my desire to become a doctor was deeply rooted in my own personal journey and aspirations. Becoming a doctor was not just a career choice; it was a calling driven by a profound passion for healing and improving the lives of others.

As an immigrant, I experienced firsthand the opportunities the United States offers to those willing to work hard and persevere. This nation welcomed me with open arms, giving me a chance for a better life and access to world-class education. The pursuit of a medical career was, for me, a way of giving back to this incredible country that has provided me with so much.

My journey to become a medical doctor reflects my resilience, determination, and deep-seated belief in the principles of knowledge and expertise. It is my way of making a meaningful contribution to society, serving the communities I call home, and honoring the opportunities this country has bestowed upon me.

I studied hard and did well on the MCAT exam. This success paved the way for my acceptance into St. George's University School of Medicine, where I embarked on my medical journey in 2001, graduating in 2005. I subsequently completed my Internship and Residency in Long Island and my Fellowship in New York City. I demonstrated my devotion to excellence, ongoing education, and commitment to providing the highest quality of care by becoming board-certified in Internal Medicine (2008), Pulmonary Disease (2010), and Critical Care Medicine (2011). These board certifications represent years of intensive training and experience.

In 2011, I married my first wife, and we were blessed with our wonderful daughter (Gabrielle, age 10). Regrettably, our union was not destined to endure, and we parted ways in 2013, finalizing our divorce in 2016.

In 2015, destiny had me cross paths with the remarkable woman who would go on to become my beloved wife, Sasha Cole. Our union has been nothing short of transformative, marked by the joyous arrival of our three wonderful sons: Benjamin, now six; Nicholas, aged four; and two-year-old Joshua.

In 2016, I was recruited for the position of Pulmonologist Intensivist at Vassar Brothers Medical Center in Poughkeepsie, New York. Between 2016 and 2020, I commuted from Brooklyn to Poughkeepsie, a decision driven by my desire to remain close to my parents and my daughter from my first marriage, Gabrielle. However, with the onset of the COVID-19 pandemic in 2020, and given the overwhelming demands of my profession, Sasha and I made the difficult but necessary decision to relocate to Hopewell Junction, New York, with our three sons. This move

was motivated by a desire to minimize my daily commute, which allowed me to devote more time to my medical responsibilities.

**Insider Trading:**

Years ago, my wife, Sasha, introduced me to Shawn Cronin, then Assistant Police Chief of Dighton, Massachusetts. He was married to her childhood friend, and he and I struck up a friendship. We often discussed investments and the stock market when we saw each other.

As you will recall, in March 2020, New York became the first battleground against Covid-19. With my specialty in Critical Care Pulmonary Disease, I suddenly found myself on "the front lines" in a war against this disease. We worked around the clock. There were many times that I slept at the hospital rather than drive home for the few hours I had before needing to return to the hospital.

In early April 2020, while working about twenty hours a day combating COVID-19 cases, Shawn Cronin sent me a text message to cheer me up and urging me to buy Portola Pharmaceuticals stock. Specifically, the text said, "If you need something to take your mind off of the everyday battle, remember the stock I told you about? Good time to buy." In the ensuing days, I discovered that Shawn had acquired knowledge through a friend, that Alexion Pharmaceuticals Inc. intended to acquire Portola Pharmaceuticals Inc., with the official announcement slated for early May.

In a matter of days, I learned that Shawn's information was coming from inside Alexion and that the expected date for the announcement was May 4, 2020. I shared this information with Dr. Paul Feldman, a nephrologist who worked with me at Vassar Brothers Medical Center. I purchased stock and call options in Portola stock using the information from Shawn Cronin. My purchases started around April 15, 2020, and continued through May 4, 2020. I also shared the Portola stock tip with my younger brother, although I did not tell him it was inside information.

May 4, 2020, passed without the anticipated announcement from Alexion, leading me to believe that the situation had resolved itself. I erroneously thought that I could evade addressing the insider trading issue further. However, on May 5, 2020, Alexion's acquisition of Portola was publicly announced, resulting in a substantial surge in Portola's stock price. I earned approximately $472,053 from my Portola stock and option purchases.

I know that I could have done things differently, and I should have done things differently. I regret that my actions resulted in insider trading by me and others to whom I passed the information. In retrospect, I now see how I could have avoided this problem:

- I should have refused to trade on the information passed on to me by Shawn Cronin.
- I should not have passed on Shawn's information to anyone else.
- Even after making my trades, I should have contacted an attorney to help me unwind what I had done before Alexion's May announcement.

Despite what I wish that I had done differently, the fact remains that I must deal with reality. Although I only understood the complete illegality of my trades after making them, now I do. The truth is that I made decisions that have broken our country's laws.

By insider trading, I knowingly violated investors' trust, the integrity of financial markets, and the foundational principles upon which our society stands. My actions betrayed the foundational values of fairness, transparency, and equality that underpin our economic system. I recognize that insider trading is not just an individual transgression; it erodes people's faith in our financial institutions and compromises the well-being of countless individuals who rely on the integrity of our markets.

I am fully aware that my choices have resulted in significant financial losses for others. The investors who placed their hard-earned money into the market trusted that the markets would treat their investments fairly and ethically. My actions shattered that trust, causing actual financial harm to individuals who may have been saving for their children's education, retirement, or other life goals. I deeply regret the suffering I have caused to these innocent individuals.

Furthermore, I acknowledge that insider trading undermines the principles of meritocracy and fair competition. It distorts the playing field, allowing those with privileged information to gain an unfair advantage over others operating within the bounds of legality and ethics. This imbalance perpetuates inequality and erodes the very fabric of our society.

I am genuinely sorry for the damage I have inflicted on the reputation of our financial markets and the broader consequences of my actions. I understand that my behavior has tarnished my character and the trust of those who once held me in esteem.

**My Path to Restitution:**
Like many individuals facing criminal charges, I deeply regret my greed and the actions that constituted my crime. However, my remorse extends beyond getting caught. I knew at the time that I was not following my moral compass. I want to make things right. I made choices that harmed our country and the laws that protect all people trading securities. I am determined to prove to my wife and children that I will work toward reconciliation with justice and restitution for the losses.

As I grapple with the gravity of my wrongdoing, I am committed to taking responsibility for my actions. I am prepared to accept the legal consequences that will follow. I also intend to make every effort to make restitution to those who have suffered financial losses due to my actions.

In addition to my legal obligations, I am committed to a path of personal growth and ethical development. I am receiving counseling and guidance to address the underlying issues that led me down this destructive path. I am determined to learn from my mistakes and to work towards becoming a responsible, ethical, and contributing member of society.

REDACTED

REDACTED                                                                        . I had
the pleasure of meeting him through my involvement with the Ethics committee at Vassar Brothers Medical Center. In my medical specialty, I often find myself in difficult "end-of-life" situations where I present the ethics committee with medical facts and inform them if there are family conflicts over the best course of action. I have talked with Rabbi Loevinger about my insider trading and his wisdom has helped me identify and address my ethical shortcomings. I am grateful for his guidance as I work to make amends.

Working with patients at the end of their lives and seeking assistance from the hospital's ethics committee has been a profoundly transformative and enlightening experience. One of the most impactful lessons I have learned is the irreplaceable value of trust in our relationships. Patients place immense trust in their physicians, relying on them to provide honest, ethical, and compassionate care. With my involvement in the ethics committee, I witnessed the devastating consequences that breaches of trust can inflict on patients and their families. My involvement in these discussions underscored the importance of maintaining the highest ethical standards in medical practice.

Moreover, my work presenting to the ethics committee illuminated the profound impact that actions, even those taken with the best intentions, can have on the lives of others. I have seen how ethical lapses can harm patients, erode public trust in healthcare, and undermine the core values that govern our profession. This first-hand exposure to the repercussions of moral transgressions has deepened my understanding of the consequences of my actions in the insider trading case.

I am acutely aware that my insider trading violated the law and betrayed the ethical principles I have always held dear as a physician. My actions eroded the trust patients and colleagues placed in me, undermining the core values of integrity and transparency that should guide all healthcare professionals.

In light of these lessons and my profound remorse, I am committed to making amends and rectifying my wrongdoings to the best of my ability. I fully accept the legal consequences that await me and am prepared to take the necessary restitution and rehabilitation steps.

I deeply regret the harm I have caused individuals and the principles of ethics and integrity I once championed. I recognize that remorse alone cannot undo the past. Still, I sincerely hope that my dedication to ethical values, my commitment to self-improvement, and my determination to rebuild trust will be a testament to my genuine remorse and decision to contribute to society again.

My medical licenses are at risk because of my conduct. Once the U.S. Attorney announced my criminal charges, Vassar Brothers Medical Center terminated my privilleges. Since then, I have only been able to secure part-time work in telemedicine while I await sentencing and a resolution to my licensing issues.

I am fortunate to have a supportive and strong family. My wife is a cardiology intensive care nurse. In recent years, she has mostly raised our sons at home while I worked in the hospital. Now that I have lost my hospital position at Vassar, I work from home part-time while Sasha works full-time to support us.

I understand I have a forfeiture obligation and wish to begin payments immediately. I have asked my attorney to help me start these payments. I am committed to making amends to the best of my ability. If I can resume full-time work in my area of specialty, my ability to make payments will be greater than it is now.

**Conclusion:**
I appeal to this Court's wisdom and compassion as you consider the path forward in my case. I understand the enormity of my transgressions and accept the consequences that must follow. I hope you will see my earnest commitment to change and my potential for positive societal contributions. I humbly request mercy as I embark on the arduous journey of rectifying my wrongdoings.

Respectfully,

Stanley Kaplan, M.D.