Hon. Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

December 22, 2023

      **Re:** *United States v. Joseph Dupont, et al.,* **23 Cr. 320 (GHW)**

Dear Judge Woods:

      We respectfully submit this memorandum in advance of defendant Joseph Dupont's sentencing in this case, which is scheduled for January 5, 2023.

      Mr. Dupont pleaded guilty on September 15, 2023 to a single count of securities fraud (Count Two of the Indictment), in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.10b5-1, and 240.10b5-2; and Title 18, United States Code, Section 2. His conviction stems from passing material non-public information belonging to his former employer, Alexion Pharmaceuticals, Inc. ("Alexion"), to a longtime friend, Shawn Cronin, who traded on that information for a personal profit. Mr. Dupont did not trade on the information or make any money from Mr. Cronin's trading.

      Under the current United States Sentencing Guidelines, Mr. Dupont faces an advisory Guidelines range of 8 to 14 months' imprisonment (the "Guidelines Range"). While the parties originally calculated the advisory Guidelines range as 12 to 18 months, this preceded a November 1, 2023 amendment to the Guidelines that provides a two-level reduction in offense level to defendants, like Mr. Dupont, who have zero criminal history points and meet certain other criteria. *See* U.S.S.G. Section 4C1.1(a)("Adjustment for Certain Zero-Point Offenders"). The amendment applies retroactively. With the reduction, Mr. Dupont's offense level is 11, instead of 13, which combined with a criminal history category of I, yields the Guidelines Range of 8 to 14 months.[1]

      The United States Probation Office (the "Probation Office") has recommended a non-custodial sentence of three years' probation, to include a four-month period of home confinement, as well as a $4,000 fine.

---

[1] At the time of the plea, the parties also agreed (as part of the written plea agreement) that a two level offense level reduction would be warranted under the then-proposed new Section 4C1.1 of the November 2023 version of the Sentencing Guidelines manual, if it were in effect on the date of the plea, and accordingly the defendant should be sentenced as though the applicable Guidelines sentencing range is 8 to 14 months' imprisonment, which is in Zone B of the Sentencing Table.

1

For the reasons discussed in more detail below, we submit that a non-custodial sentence is warranted in this case, and would be sufficient, but not greater than necessary, to achieve the goals set forth in Title 18, United States Code, Section 3553(a).  While we believe that the unusual circumstances of this case, together with Mr. Dupont's history and characteristics, warrant a below-Guidelines sentence of time served, the advisory Guidelines Range also allows for a non-custodial sentence that falls within the Guidelines, because the 8 to 14 month range comes within Zone B of the Sentencing Table.  Pursuant to U.S.S.G. §5B1.1, a sentence of probation for Mr. Dupont that included a period of home confinement, but not a period of incarceration, would fall within the Guidelines Range.

We respectfully ask the Court to impose a sentence on Mr. Dupont that does not require prison time.  The circumstances of Mr. Dupont's offense are unusual, and his acceptance of responsibility upon being charged was almost immediate.  Mr. Dupont tipped his childhood friend with no expectation or hope of profit for himself, and he received no money.  He pleaded guilty before the production of any Rule 16 discovery.  He has never had a criminal conviction before and, based on his age and the manner in which he has lived his entire life, he is extremely unlikely to reoffend.  He has suffered severe consequences already as a result of his misconduct, losing his job, damaging his reputation, and forfeiting the chance to work ever again as the director or officer of a public company, pursuant to a resolution he has agreed to with the Securities and Exchange Commission (the "SEC").  Moreover, his conduct since the time of his arrest has been exemplary, including seeking out and obtaining another full-time job within a month of being fired and becoming invaluable to his current employer.  The letters submitted on Mr. Dupont's behalf also show him to be, without exaggeration, a pillar of his family and community.  A non-custodial sentence in this case would best comport with the factors set forth in Section 3553(a).

I.   **Nature and Circumstances of the Offense**

Title 18, United States Code, Sections 3553(a)(1) and (2) require the Court to consider the nature and circumstances of the offense, as well as the need for the sentence to reflect the seriousness of the offense and promote respect for the law, in determining the particular sentence to be imposed.  The offense of conviction here is insider trading, a form of cheating that damages confidence in the financial markets and that Mr. Dupont had no reason, or excuse, to commit.  In January 2020, in his capacity as a vice president of Alexion, Mr. Dupont became aware that Alexion planned to acquire another biopharmaceutical company called Portola Pharmaceuticals, Inc. ("Portola"). *See* Presentence Investigation Report ("PSR") ¶¶ 15-16.  Part of Mr. Dupont's job in the ensuing months was to perform due diligence on Portola in advance of the potential acquisition.  *See id.* ¶ 16.  Beginning around April 2020, several weeks before he believed the acquisition would take place, Mr. Dupont shared information about the prospective acquisition with a childhood friend, Shawn Cronin. *See id.* ¶ 17.  This information was material and non-public; it belonged to Alexion; and it was not Mr. Dupont's to share.  Mr. Cronin traded on the information and made approximately

2

$71,996 for himself. *See id.* ¶¶ 17, 25. Others whom Mr. Cronin himself tipped in turn, unbeknownst to Mr. Dupont, made several multiples more. *See id.* ¶ 25.

Mr. Dupont did not trade on the information, and had no arrangement with Mr. Cronin or anyone else to receive any money. He did not profit in any way from his conduct, and he had no hopes or plans to do so. There was no rhyme or reason to Mr. Dupont's offense other than an ill-conceived benefit to Mr. Cronin.

After the public announcement of the Portola acquisition, the Financial Industry Regulatory Authority ("FINRA") asked Alexion whether any of the names on a list of people who had placed well-timed trades in Portola stock were recognizable to employees, such as Mr. Dupont, who were involved in the acquisition. *See id.* ¶ 27. Mr. Dupont acknowledged that he recognized the names of Mr. Cronin and another individual, Jared Mendoza, but he did not disclose that he had discussed the acquisition with Mr. Cronin. *See id.*[2] Late in October 2022, Mr. Dupont was approached by law enforcement officers and told them, in substance, that he had not been aware of when the Portola acquisition would occur and had not disclosed information about in advance to Mr. Cronin. Those statements were not true, as Mr. Dupont knew about the Portola acquisition and shared material non-public information about it with Mr. Cronin in advance. The statements did not impede the Government's investigation.

Mr. Dupont was arrested on June 29, 2023. He pleaded guilty to Count Two of the Indictment on September 15, 2023, less than three months later. He pleaded guilty before receiving any Rule 16 discovery in the case. His acceptance of responsibility without waiting for Rule 16 discovery, together with the absence of any profit and the fact that he did not attempt or hope to make any profit for himself from his conduct, are unusual aspects of the nature and circumstances of Mr. Dupont's offense that support a non-custodial sentence.

## II.     History and Characteristics of Mr. Dupont

Section 3553(a)(1) also requires the Court to consider Mr. Dupont's history and characteristics in determining the sentence to be imposed. Mr. Dupont's history and characteristics militate strongly in favor of a non-custodial sentence. As Jason Pratt (Mr.

---

[2] Based on information that the Government provided to the Probation Office, which the defense understands to be something that a witness told the Government in the course of its investigation, the PSR states that Mr. Dupont also recognized the name of Stanley Kaplan – an individual who was tipped by Mr. Cronin and traded – on the FINRA list, but failed to acknowledge that he recognized it. *See* PSR ¶ 27. Mr. Dupont objected to this item in the draft version of the PSR, because he does not believe that he knows Mr. Kaplan, and believes that the source of the Government's information on this point may be mistaken. The Probation Office included the item in the PSR over Mr. Dupont's objection, based on the Government's representation to the Probation Office. The defense does not believe this disputed fact is material to Mr. Dupont's position as to sentencing, and is not seeking to pursue a hearing to resolve it.

3

Dupont's wife's brother) puts it in a letter submitted on Mr. Dupont's behalf: "While I understand the gravity of the offense Joe has pleaded guilty to, I firmly believe that it does not entirely define his character. This unfortunate incident is an aberration in an otherwise exemplary life of a hardworking, dedicated, kind, empathetic, wise man." Exhibit A. Every aspect of Mr. Dupont's history and characteristics, and every letter submitted on his behalf, substantiate this character sketch by his brother-in-law. The letters are universal in demonstrating that Mr. Dupont "truly makes everyone around him better," Exhibit B at 1, and that the offense conduct in this case is an outlier in his life.

Mr. Dupont is 45 years old and this is his first conviction. *See id.* ¶ 55. He pleaded guilty almost immediately after being charged. Mr. Dupont did not wait for even the most basic elements of a litigation to unfold, such as the production of Rule 16 discovery. His sole focus since his arrest has been to take responsibility, put this one-off chapter of his life behind him, and continue dedicating himself to his family and work. As summarized by a close friend of Mr. Dupont's, "[d]uring this time, Joe has taken ownership of the mistakes he has made and is willing to take responsibility for his actions." Exhibit C.[3] His brother Marc makes a similar observation: "I have had an opportunity to talk to [Mr. Dupont] about the situation and he has completely owned it [and] has not made a single excuse." Exhibit B at 1. That is entirely consistent with, and illustrative of, Mr. Dupont's history and characteristics.

With the exception of this offense, a devotion to family and to hard work has characterized practically the entirety of Mr. Dupont's life. These traits reach all the way back to childhood. As a child, Mr. Dupont shared his home with foster children and stood up for them in school. *See id.* ¶ 56; Exhibit B at 1. A longtime friend of Mr. Dupont and his parents, Kerri Spellman, recalls that when Mr. Dupont was growing up, he treated these children like siblings and that his (and his other family members') support were incredibly meaningful. *See* Exhibit D. Mr. Dupont began working to earn money for his family, weeding fields, when he was still in middle school, due to his father suffering a serious fall at work and becoming disabled. *See* PSR ¶ 57. He pushed himself extremely hard to succeed in school when academic achievement did not come easily to him, *see id.* ¶¶ 56, 58, and much later on, when he became a father and his oldest daughter similarly struggled academically, he put the same amount of work into making sure she was situated in an environment where she could succeed, *see* Exhibit E.

When Mr. Dupont got a job after college, at Pfizer, he bought his mother a car. *See* PSR ¶ 59. He worked his way up at Pfizer for 11 years. *See id.* In 2012, his father died of a heart attack, and his priorities shifted to helping his mother. *See id.* ¶ 60. Mr. Dupont's brother-in-law notes that the death of his father helped Mr. Dupont to empathize with him years later when he lost his own father, and that Mr. Dupont made it a point to "consistently check-in" on him because he wanted to do all that he could to

---

[3] This same friend characterizes Mr. Dupont as an "honest, trustworthy, and reliable friend," and credits him with helping him through the hardest times of his life. Exhibit C. These are common themes that run through all of the letters submitted on Mr. Dupont's behalf.

4

"help [him] through."  Ex. A.  Mr. Dupont's cousin-in-law Eric Veiga had a similar experience: he recalls Mr. Dupont's "compassion" when he (Mr. Veiga) lost his own father as the factor that "truly helped me through such a difficult time in my life."  Exhibit F at 1.

When Pfizer refused Mr. Dupont's request to work remotely part of the time so that he could live closer to his mother following his father's death, he quit without having another job lined up so that he could spend the time he needed to with her.  *See* PSR ¶ 60.  He found a job at Genzyme in Cambridge, Massachusetts, *see id.* ¶ 78, and while there he also joined the reserve police officer force in order to spend more time working directly with the community, *see id.* ¶ 61.  Mr. Veiga refers to Mr. Dupont's role with the police force as a "second job" that Mr. Dupont works at because of his strong belief in protecting the community.  Exhibit F at 2.

In early 2020, Mr. Dupont's mother was diagnosed with terminal brain cancer.  *Id.* ¶ 63.  After she had surgery, Mr. Dupont moved in with her.  *See id.*  Mr. Dupont and his wife, Jennifer, became his mother's primary caregivers in the last year of her life.  *See id.*  They gave up their own bedroom for her.  *See* Exhibit G at 1.  The grace and thoughtfulness with which Mr. Dupont handled these circumstances when they befell his family made an extremely strong impression on his family members, and they are of a piece with the character that he has demonstrated throughout his life.  Mr. Dupont's oldest daughter, Ryan, remembers Mr. Dupont being the "glue" who held the family together during this time.  Exhibit E.  Mr. Dupont's brother, Michael, similarly remembers Mr. Dupont being the person who "provided solace to our mom and family, and his presence was a source of strength for us all."  Exhibit H at 1.  He says that Mr. Dupont "personally made sure our mom was truly taken care of from the initial diagnosis to having her move in with him and his family to her eventual passing."  *Id.*  A cousin-in-law of Mr. Dupont's, Rhonda Veiga, recalls from this period that "I watched Joe care for her . . . Joe spent every night with her . . . ."  Exhibit I at 1.  Her husband Eric says that Mr. Dupont's care for his mother "transcended anything I've seen before."  Exhibit F at 2.

Mr. Dupont took his mother to each of her medical appointments, four days a week.  *See* PSR ¶ 63.  In the last months of her life, he sold his house to buy a home with a view of the water so that his mother could live there, something she had always wanted to experience.  *See id.*  She died in December 2020.  *See id.*  Presently, Jennifer's stepfather is suffering from rectal cancer, and Mr. Dupont drives his in-laws' car from Massachusetts to Florida and back every year in order to make sure they can continue to spend time in both places.  *See id.* ¶ 64.

Today, Mr. Dupont lives in Rehobeth, Massachusetts with Jennifer and their two teenage daughters, Ryan (17) and Addie (15), who are in high school and live at home.  *See id.* ¶ 65.  Their family unit is extremely tight-knit, something that others outside the nuclear family regularly observe.  For example, Jennifer's brother notes that Mr. Dupont "demonstrates unwavering . . . support[] and dedication with everyone in his life . . . most of all, my sister and her children."  Exhibit A.  Mr. Dupont's longtime friend John Nunes

5

likewise states that "the emphasis and love that [Mr. Dupont] pours into his relationships with family and friends is like nothing I've ever seen." Exhibit J. His cousin-in-law Rhonda Veiga says that Mr. Dupont is so important to his daughters that she "cannot fathom the reality that his daughters may be without him for any period of time." Exhibit I at 2. Her husband, Eric Veiga, describes Mr. Dupont's relationships with his family and friends as being based on "respect and camaraderie." Exhibit F at 1.

Mr. Dupont describes his own bond with his wife and children as "unbreakable." PSR ¶ 64. His daughters are even more emphatic, and have written to the Court about the importance of their father in their lives in striking terms. Ryan describes Mr. Dupont as her best friend and attributes her own sense of empathy to the example he has set for her, saying that her father "has the biggest heart out of anyone I know . . . I think I get that from him." Exhibit E. She speaks movingly about the emotional support Mr. Dupont provides to her as a junior in high school, and that he has been providing for her on a constant basis since she was a much younger child taking gymnastics classes, when he would build her self-esteem. *See id.* It is plain from her letter how impactful a custodial sentence for Mr. Dupont would be on the family. *See id.* Addie speaks similarly about the unwavering closeness and support her father has provided to her throughout her entire life, and continues to provide. *See* Exhibit K. His parenting has made such a positive impact on her that she says, "I look up to my father more than anyone else in my life." *Id.* That is a powerful reflection of the degree to which Mr. Dupont has devoted his life to building a family and fostering a loving environment, and of the vital role he plays in the everyday lives of his children.

Mr. Dupont and Jennifer met in college and have been married for 19 years. Jennifer describes Mr. Dupont as a "very present family man" whose absence from home would have a "tremendous effect" on their family. *Id.* ¶ 66. She knows him to be a "very generous, extremely caring" man. *Id.* Her letter to the Court in support of her husband is the portrait of a person who has dedicated his entire adult life to building and maintaining a loving and supportive family environment. She discusses the example he has set for his daughters since they were young and continuing through today. *See* Exhibit L at 2. She discusses the practical sacrifices he has made for the benefit of her and their children, including walking four miles a day to the train station to make sure they could have use of the family car. *See id.* at 1-2. She discusses the ways he cared for her during the dangerous and terrifying experience of her first childbirth. *See id.* at 1. She discusses his everyday importance to the happiness of their family. *See id.* Her letter is as revealing a testament to Mr. Dupont's history and characteristics as a person could have.

Mr. Dupont has been steadily employed since 2001. *See id.* ¶¶ 75-79. In July 2023, after he was fired from his job at Biogen due to his June 2023 arrest in this case, *see id.* ¶ 76, he began new full-time employment as a business development manager at Blue Stone Construction in Dighton, Massachusetts, where he hopes to continue working until he is in a position to explore starting a family business focused on wellness, *see id.* ¶¶ 75, 68. His boss at Blue Stone, Steven Reed, is aware of this case, and submitted a letter to the Court on Mr. Dupont's behalf. *See* Exhibit M.

6

Mr. Reed's description of Mr. Dupont's role at the company sheds a remarkable light on the commitment and energy Mr. Dupont has devoted to his new job while under the stress of an impending plea and, now, an impending sentence. Mr. Reed says that Mr. Dupont has become "a vital part of [his employer's] day-to-day operations" and a "critical" contributor to the company since joining in July of this year. *Id.* He cites to the "positive energy" that Mr. Dupont has brough to the office and the significant impact Mr. Dupont has had on the other employees' morale – an amazing testament to Mr. Dupont, given the stress that he is under in his own life right now. Mr. Dupont's ability to lift others at the company up regardless of his personal circumstances is consistent with the regard for others that he has shown his entire life. The fact that within a month after his arrest and termination from his former job, Mr. Dupont not only sought out new employment but also dedicated to it the time and energy necessary to excel at it, is likewise consistent with the work ethic that he has always had, and speaks to what the Court can expect from Mr. Dupont once this case is behind him.

The number of people who have submitted letters to the Court seeking to shed light on Mr. Dupont's character, and his lifetime of good deeds, is extraordinary, and reveals how many lives Mr. Dupont has touched for the good. A longtime friend of Mr. Dupont's states that "[a]nyone who knows [Mr. Dupont] has benefited one way or another from his charitable donations," and describes him as "a valuable member of my community." Exhibit J. His brother Marc makes note of the amount of time Mr. Dupont volunteers to various causes in his community. *See* Exhibit B at 1. His cousin-in-law, Ms. Veiga, describes his values as "hard work, perseverance, loyalty, religion, education, goal setting, goal achievement, striving to be better than the day before, family, the simple things in life, making positive memories, being a role model for the younger generation, respecting elders and authority figures, and so many more positive things." Exhibit I at 1. Her husband Eric relates how Mr. Dupont gave his own car to Eric's son on the condition that Eric's son would maintain a "B" average in school. *See* Exhibit F at 1. The Fire Chief of the town where Mr. Dupont lives describes him as someone who "would give you the shirt off his back if he knew you were struggling and wouldn't expect a thing in return. In fact, he gets insulted if you try . . . ." Exhibit N. He recalls a number of illustrative acts of kindness from Mr. Dupont, including giving back prize money he won at a fundraiser; volunteering for the community on his days off; and spending time with him as a friend to support him when his mother was suffering from cancer. *See id.* These are the types of things that cause people who know Mr. Dupont to describe him as a "pillar of the community." Exhibit A.

Even more remarkably, the mother of one of Ryan's friends, Jennifer Masse, credits Mr. Dupont with essentially stepping in for her son's absent father and dedicating an incredible amount of time and energy to help guide him through his teenage years, including by inviting him on trips with Mr. Dupont's family, spending one-on-one time with him, and speaking frankly with him about making good decisions. *See* Exhibit O. Her son echoes this in his own letter, calling Mr. Dupont the first true "male role model" in his life. Exhibit P. His anecdotes about the sense of welcome that Mr. Dupont extends to him and to everyone else in his orbit, through games of cornhole and otherwise, are difficult to summarize without sacrificing their charm. Ms. Masse's letter and her son's

7

letter are vivid, and moving, examples of Mr. Dupont's generousness of character extending well beyond caring for his family, his friends, and even his own peers. His mother-in-law seems to speak for Mr. Dupont's entire community when she says, "If I ever need anything I know I can count on Joe to be there for me in any way I need." Exhibit G.

In sum, Mr. Dupont has led an incredibly productive life devoted to his family and his community. He is relied upon and loved. The testaments provided by those who submitted letters put into relief that his offense conduct was "a singular lapse in personal and professional judgment," Exhibit Q, against the background of a lifetime of helping others and prioritizing them over himself. His history and characteristics strongly support a non-custodial sentence, both to account for the good he has done in the past and to allow him to continue to be there for his family in the immediate future.

### III.     Specific and General Deterrence

Title 18, United States Code, Sections 3553(a)(2)(B) and (C) require the Court to consider the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. Here, there is little to no risk of further crimes from the defendant. Mr. Dupont is in his mid-40s and this is his first offense; he has been steadily employed for his entire adult life and pursued new employment even after his arrest in this case; he has demonstrated positive values throughout his life and has a tremendous support network of friends and family; and he took accountability for his conduct right away, pleading guilty before the production of Rule 16 discovery. Specific deterrence need not be a driving factor of the sentence imposed.

With respect to general deterrence, there is no debate that insider trading is a serious offense that must be deterred. Due to his conduct, Mr. Dupont is now a convicted felon; he lost his job and forfeited the career path that he has worked for since graduating college; he is agreeing to an officer and director bar with the SEC that will prevent him from ever having the type of job he had previously; and he may be subject to a financial penalty in this case or in his parallel case with the SEC. His indictment, and plea, were announced in public press releases and covered in at least one news publication in the area where he lives. Worst of all, for Mr. Dupont, is the shame that his case has caused him to feel within his family and community, and the anxiety that he has caused his immediate family. Weighed in tandem with the other Section 3553(a) factors that apply to Mr. Dupont, including his history and characteristics, the need for general deterrence is appropriately addressed through a non-custodial sentence in the circumstances of this case.

### IV.     Avoiding Unwarranted Sentence Disparities

Title 18, United States Code, Section 3553(a)(6) lists "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" as one of the factors for the Court to consider in

8

determining a just sentence. The rare circumstances of Mr. Dupont's offense – the absence of any gain on his part, his Zone B advisory Guidelines range, and his immediate plea – are such that a non-custodial sentence presents no risk of creating unwarranted sentence disparities with similarly situated defendants.

An extremely brief survey of two comparable cases in this District reinforces this point. In *United States v. Gallagher*, 22 Cr. 122 (VEC), the defendant was convicted (following a guilty plea) of orchestrating a pump-and-dump scheme for his own profit, pursuant to which he had personally made at least $22,000. *See* Dkt. #23 at 2-3. Part of his scheme involved posting misleading tweets to his online followers so that they would – against their own interests – buy stock that he himself was secretly selling. *See id.* at 3. Like Mr. Dupont, the defendant pleaded guilty within several months of being arrested and before receiving Rule 16 discovery. *See id.* at 4. Also like Mr. Dupont, the defendant faced an advisory Guidelines range of 8 to 14 months' imprisonment, and the Probation Office recommended a non-custodial sentence. *See id.* The Government asked for a term of imprisonment within the advisory Guidelines range. *See id.* Judge Caproni imposed a sentence of time served, three years of supervised release to include a six-month term of home confinement, and a $10,000 fine. *See* Dkt. #24.

In *United States v. Benjamin Chow*, 17 Cr. 667 (GHW), which this Court presided over, the defendant was in the unusual circumstance of having tipped without making any profit for himself and having otherwise lived an exemplary life dedicated to family and hard work – facts that apply equally to Mr. Dupont. Mr. Chow was sentenced to a three-month term of imprisonment after being convicted at trial and facing an advisory Guidelines range of 78 to 97 months. Mr. Dupont's circumstances are even rarer than Mr. Chow's, taking into account the rapidness with which he accepted responsibility and the fact that his advisory Guidelines range is in Zone B.

Each of these cases had its own particular set of facts and circumstances, as does Mr. Dupont's case, and distinctions can be made among all of them. But they provide a framework to assess whether a non-custodial sentence for Mr. Dupont would create unwanted sentence disparities among similarly situated defendants. It would not.

Finally, the Probation Office notes that over the course of the last five years, there were an insufficient number of defendants who, like Mr. Dupont, had a primary Guideline of §2B1.4, a final offense level of 11, and a criminal history category of I, who received a sentence of imprisonment in whole or in part, to provide meaningful Judiciary Sentencing Information data to the Court. *See* PSR at p. 25. This finding reinforces that a non-custodial sentence here would not create an unwarranted disparity in sentences among similarly situated individuals, and instead, would be in line with such sentences.

## V.     The Kinds of Sentences Available and the Guidelines Range

Sections 3553(a)(4) and (5) also require the Court to consider the kinds of sentences available and the advisory Guidelines Range in determining the sentence to be imposed. Here, the advisory Guidelines Range contemplates the option of a non-

custodial sentence with a period of home confinement.  The Probation Office, having interviewed Mr. Dupont in depth, recommends such a sentence.  Consistent with the recommendation of the Probation Office, and for all of the reasons discussed herein, we respectfully submit that a non-custodial sentence is warranted in this case.

**5.     Conclusion**

For all of the reasons discussed above, we respectfully ask that the Court impose a non-custodial sentence on Mr. Dupont.

Respectfully submitted,

_____/s_____

Max Nicholas
Spears & Imes LLP
Counsel for Joseph Dupont
212-213-1715
mnicholas@spearsimes.com

10