

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 28, 2023

**By ECF**
The Honorable Gregory H. Woods
United States District Judge
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Joseph Dupont*, 23 Cr. 320 (GHW)

Dear Judge Woods:

    The Government respectfully submits this letter in advance of sentencing. Joseph Dupont, the defendant, misappropriated material nonpublic information ("MNPI") from his company and provided it to his childhood friend so that that friend could profitably trade on it. In so doing, Dupont set in motion of series of events in which multiple individuals shared and traded on inside information for unlawful personal gain. As set forth below, a sentence of imprisonment at the bottom of the Guidelines range of 8 to 14 months would be sufficient but not greater than necessary to comply with the purposes of sentencing.

**I.    Background**

    **A.    Overview**

    In April 2020, Dupont provided his childhood friend, codefendant Shawn Cronin, with MNPI that Dupont had learned and misappropriated in the course of his employment as a Vice President at Alexion Pharmaceuticals, Inc. ("Alexion")—namely, that Alexion was imminently going to acquire Portola Pharmaceuticals, Inc. ("Portola"), a publicly traded biopharmaceutical company. After the tip and over the course of April 2020, Cronin purchased Portola stock and call options on the basis of the MNPI that he received from Dupont, and also tipped two friends, both of whom were known to Dupont—Kaplan and Jarett Mendoza—regarding the pending acquisition so that they too could make profitable trades in Portola stock and options. Although both Kaplan and Mendoza were known to Dupont, it was not until after the public announcement of the Portola acquisition that Dupont learned that Cronin had tipped Kaplan and Mendoza.

    Following his receipt of the MNPI from Cronin, Kaplan used that MNPI in purchasing both stock and call options in Portola. Kaplan further told other individuals to purchase Portola stock, including a member of his family ("Kaplan Family Member-1") and his friend and colleague, codefendant Paul Feldman. Kaplan described the planned acquisition of Portola to Feldman as a "high confidence event." Feldman, after hearing the news of the upcoming acquisition, texted Kaplan: "I'm gonna owe you big."

Although Feldman had purchased Portola stock historically, he began aggressively purchasing call options in Portola based on the inside information about the Portola acquisition that he received from Kaplan. Feldman, like Kaplan, shared that information with friends, family, and colleagues, including a member of his family ("Feldman Family Member-1") and four associates ("Individuals-1, -2, -3, and -4"). In instructing Individual-1, a colleague from work with whom Feldman was close, to purchase Portola stock, Feldman wrote, "Buy 50 more PTLA [Portola]. Youll [sic] be slightly more on margin. After the buyout you can sell it all," referring to the upcoming Portola acquisition.

Based on the MNPI that Dupont misappropriated from Alexion, Dupont, Cronin, Kaplan, and Feldman collectively caused at least seven other people to trade in Portola stock.

Alexion's acquisition of Portola was announced publicly on the morning of May 5, 2020. Portola's stock increased significantly in value. Cronin, Kaplan, Feldman, and their tippees sold their shares of Portola and call options for Portola stock, reaping millions of dollars of illegally obtained trading profits. Cronin, Kaplan, and Feldman made a total of roughly $2.2 million dollars in illegal profits by trading in stock and options based on the MNPI that Dupont shared with Cronin.

### B.  Dupont's Acquisition of MNPI

Portola was a commercial-stage biopharmaceutical company that traded under the symbol "PTLA" on the Nasdaq Global Market, which is headquartered in New York, New York. In February 2020, Alexion informed Portola of its interest in a potential acquisition of Portola at a price of $18 per share. Portola confirmed its offer in a non-binding letter, and discussions regarding a potential acquisition continued into April 2020, when Alexion and Portola entered into a confidentiality agreement for the purposes of continuing their discussions of a possible acquisition. (PSR ¶ 15).

Dupont was informed of Alexion's upcoming acquisition of Portola on January 31, 2020. On April 1, 2020, Alexion submitted a non-binding indication of interest to acquire Portola for $18 per share. That day, Portola was trading between approximately $6.41 and $7.14 per share. As of April 3, 2020, Dupont, among others, was tasked with performing due diligence on Portola in anticipation of the acquisition. On that date, Dupont was informed that the acquisition would be announced the week of May 4, 2020. In the weeks that followed, Dupont continued to work on the anticipated acquisition up to the public announcement on May 5, 2020. In connection with his work, Dupont was provided records regarding confidential details relevant to the transaction and joined conference calls in which the anticipated acquisition was discussed. (PSR ¶ 16).

### C.  The Insider Trading in Portola

Between April and May 2020, Dupont abused the trust and confidence placed in him by Alexion by providing information about the Portola acquisition to his close friend, Cronin, with the expectation that Cronin would use that information to engage in insider trading in Portola stock. In addition to being childhood friends, Cronin, who at the time was a sergeant in the police department of Dighton, Massachusetts, and later served as that town's police chief, supervised Dupont in Dupont's capacity as a reserve officer in that police department. (PSR ¶ 17).

For example, on April 8, 2020, an internal Alexion call was scheduled for the purpose of discussing commercial diligence of Portola in advance of the acquisition. That evening, Dupont called Cronin, and the two spoke for approximately twenty minutes. A few minutes after that call, Cronin texted his friend, Kaplan, "If you need something to take your mind off of the everyday battle, remember the stock I told you about? Good time to buy." Cronin then placed an order for 1,394 shares of Portola. (PSR ¶ 18).

Dupont continued to share information with Cronin about the impending acquisition of Portola throughout the months of April and May 2020. On the basis of that information and Dupont's initial disclosure, Cronin purchased 700 additional shares of Portola on April 23, 2020, and purchased out-of-the-money call options for Portola stock on April 28, May 1, and May 4, 2020. (PSR ¶ 18).

Cronin in turn shared the MNPI about Portola's pending acquisition with Kaplan, who was known to Dupont. Cronin shared the information both so that Kaplan could trade in advance of the acquisition and so that Kaplan would assist Cronin in formulating trading strategies designed to maximize Cronin's own insider trading profits. Cronin also tipped Mendoza, a childhood friend of Cronin and Dupont, about the impending acquisition and assisted Mendoza in purchasing Portola stock in the days before the planned acquisition was made public. Dupont learned that Cronin tipped Kaplan and Mendoza only after the public announcement of the Portola acquisition. (PSR ¶ 17).

After Cronin informed Kaplan about the upcoming acquisition of Portola, Kaplan further shared that information with his colleague, Feldman, so that Feldman could trade on it. For example, on April 26, 2020, Feldman confirmed his understanding of the upcoming Portola acquisition, texting "Likarstva …Made by alexion.. alexion is buying…P_____?" Kaplan texted Feldman back, in Russian, "Yes." (PSR ¶ 21).

Less than a week later, on Friday, May 1, 2020, Feldman texted Kaplan, "Hopefully Monday [May 4, 2020] is a big day. It's supposed to be Monday right?" Notably, May 4, 2020, was the initial target date for the announcement of the Portola acquisition (although that acquisition ultimately was announced on May 5, 2020, before markets opened). (PSR ¶ 21).

On the basis of the illegal tips that he received throughout April and early May 2020 regarding Portola's impending acquisition, Kaplan placed orders to buy Portola stock and out-of-the-money call options on multiple occasions from April 15, 2020, to May 4, 2020. Consistent with his understanding that the Portola acquisition would be announced on May 4, 2020, that morning, Kaplan placed a premarket order to purchase 65 Portola call options contracts with an expiration date of May 15, 2020 and a strike price of $10, which was significantly higher than the $7.04 closing price of Portola stock on the prior trading day, making those options out-of-the-money, and reflecting a belief by Kaplan that the price of Portola stock would rise by May 15, 2020. (PSR ¶ 19).

Feldman used the illegal tips that he received regarding Portola's impending acquisition to purchase call options for Portola stock from April 23, 2020, to May 1, 2020. Consistent with Feldman's understanding that May 4, 2020 was when the acquisition would be announced, on

April 29 and May 1, 2020, he placed multiple orders to buy out-of-the-money call options for Portola stock with expiration dates in mid-May and mid-June 2020.  (PSR ¶ 23).

In addition to their own trading, in April and early May 2020, in advance of the public announcement of the acquisition, Kaplan and Feldman each encouraged friends, family members, and colleagues to purchase Portola stock, which many did.  (PSR ¶ 24).

On May 5, 2020, at approximately 7:00 a.m., Alexion and Portola publicly announced that the companies had entered into a definitive agreement pursuant to which Alexion would acquire Portola for $18 per share in cash via a tender offer.  Following the news, Portola's stock price rose from $7.76, where it had closed the day before, up to $17.91 per share, an increase of more than 130%.  In the days after the announcement, Cronin sold the majority of his Portola shares and call options, earning approximately $71,996.06 in insider trading profits.  Kaplan likewise sold all his shares and options, earning approximately $472,053.61 in insider trading profits.  Feldman sold all his shares and options, earning approximately $1,730,827.54 in insider trading profits.  (PSR ¶ 25).

### D. Post-Trading Conduct

Following the public announcement, Kaplan and Feldman sent and received text messages, cryptically referring to an insider source and reflecting their shared expectation of continuing to receive inside information regarding Alexion derived from the same source that had provided information about the then-confidential acquisition announcement, and their intention to engage in further unlawful trading based on nonpublic information:

On May 13, 2020, Individual-1 texted Feldman, "I need more inside information."  (PSR ¶ 26).

On May 15, 2020, Feldman texted Kaplan, "Knowing of a buyout or any news beforehand is gol[d]."  Kaplan texted back:  "Yup," adding in Russian, in substance, "Let's hope our golden goose will continue laying golden eggs!"  (PSR ¶ 26).

On May 23, 2020, while discussing trading strategies for an upcoming stock purchase, Feldman texted Kaplan:  "All we need is a little bit of luck.  Having golden goose definitely doesn't hurt."  Kaplan responded, "Oh yeah," adding in Russian, in substance, "I am expecting a report from Stierlitz soon!," referring to a fictional character in a Russian book series who was a Soviet agent who infiltrated Nazi command.  (PSR ¶ 26).

Subsequently, on Tuesday, June 23, 2020, Feldman texted Kaplan:  "We need to decide on ALXN [Alexion] in next 2 days."  Kaplan then texted Cronin, "Hey, I just realized, next week is a short trading week because of the Fourth of July, we need to make a game plan by this Thursday morning so we can buy all the calls we want."  Cronin responded, "Ok."  The following day, Cronin texted Kaplan, "It's going to be impossible for me to see my buddy until the weekend," referring to Dupont.  Kaplan responded to Cronin, "No worries. We'll do what we can on Monday."  Cronin nonetheless made several attempts that afternoon to visit Dupont, ultimately meeting with him in person that evening.  Immediately after seeing Dupont, Cronin called and spoke to Kaplan.  (PSR ¶ 26).

As for Dupont's conduct after the public announcement of the Portola acquisition, the Financial Industry Regulatory Authority ("FINRA") launched an inquiry into trading in Portola stock, and asked Alexion whether any of the names on a list of people who had placed well-timed trades in Portola stock were recognizable to employees who were involved in the acquisition. Dupont was provided the list and recognized the names of Cronin, Kaplan, and Mendoza. Dupont falsely responded that he had not discussed the upcoming acquisition with Cronin or Mendoza and failed to identify Kaplan as an individual whose name he recognized. (PSR ¶ 27).[1]

Additionally, in October 2022, Dupont was approached by law enforcement and voluntarily answered questions. Dupont stated to law enforcement that he was not aware of when the Portola acquisition would happen. But Dupont had received emails setting forth the timing of the acquisition ahead of time. After law enforcement showed Dupont call records between Dupont, Cronin, and Mendoza, Dupont stated to law enforcement that he did not disclose information about the Portola acquisition to Cronin or Mendoza. Dupont stated to law enforcement that Dupont first was made aware of Cronin's and Mendoza's purchases of Portola stock when Dupont saw their names on a list during FINRA's inquiry. Dupont claimed that he was surprised to see Cronin's and Mendoza's names on that list. Those statements were false or misleading or both. (PSR ¶ 28).

\* \* \*

In summary: Dupont, who did not trade, tipped Cronin, who traded. Cronin, in turn, tipped Kaplan and Mendoza, each of whom traded. Kaplan, in turn, tipped Feldman and Kaplan Family Member-1, each of whom traded. And Feldman, in turn, tipped Feldman Family Member-1 and Individuals-1, -2, -3, and -4, each of whom traded. Below is a table that shows each individual's gains from trading on the MNPI:

---

[1] Although the defense maintains that Dupont did not know Kaplan, and thus did not fail to recognize Kaplan on the FINRA list, the defense does not seek a hearing on that disputed fact. (Dkt. 71 at 3 n.2). The Government similarly does not request a hearing on that disputed fact. Dupont acknowledges that he provided false information in connection with the FINRA inquiry by indicating that he did not discuss the upcoming acquisition with Cronin or Mendoza. From the Government's perspective, what matters for sentencing purposes is that Dupont provided some false information in connection with the FINRA inquiry, and that Dupont acknowledges having done so.

| NAME | GAIN |
|---|---|
| Cronin | $71,996.06 |
| Kaplan | $472,053.61 |
| Mendoza | $38,648.58 |
| Kaplan Family Member-1 | $112,032.00 |
| Feldman | $1,730,827.54 |
| Feldman Family Member-1 | $318,901.91 |
| Individual-1 | $2,952.00 |
| Individual-2 | $1,276,920.10 |
| Individual-3 | $14,190.60 |
| Individual-4 | $2,074.01 |
| TOTAL | $4,040,596.41 |

## II. Procedural History

On July 29, 2023, Dupont was arrested after having been indicted on three counts: (a) one count of Title 15 securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5, 240.10b5-1 & 240.10b52, and 18 U.S.C. § 2, for causing Cronin to purchase shares of Portola stock and call options for Portola stock from April 8 to May 4, 2020 (Count Two); (b) one count of Title 18 securities fraud, in April 2020, in violation of 18 U.S.C. §§ 1348 & 2 (Count Twelve); and (d) one count of tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2, for causing Cronin to purchase shares of Portola stock and call options for Portola stock from April 8 to May 4, 2020 (Count Thirteen). (PSR ¶¶ 1-5, 29).

On September 15, 2023, Dupont pled guilty, pursuant to a plea agreement, to Count Two. In the plea agreement, the parties agreed to substantially the same Guidelines calculation that Probation employed in the PSR, except that Probation included the two-level reduction under Guidelines Section 4C1.1, which went into effect after the plea agreement was executed and Dupont pled guilty. The parties agree that Section 4C1.1 applies, so the parties and Probation all agree on the following Guidelines calculation:

- Pursuant to U.S.S.G. § 2B1.4(a), the base offense level is eight.

- Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(D), because the gain resulting from the offense was $71,996.06—that is, more than $40,000 but not more than $95,000—six levels are added.

- Pursuant to U.S.S.G. § 3B1.3, because Dupont abused a position of private trust in a manner that significantly facilitated the commission of the offense, two levels are added.

- Pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b), three levels are subtracted for acceptance of responsibility.

- Pursuant to U.S.S.G. § 4C1.1(a), two levels are subtracted because Dupont has no criminal history points and meets the other criteria set forth in section 4C1.1(a).

- The Guidelines offense level is 11, Dupont is in Criminal History Category I, and the Guidelines range is 8 to 14 months' imprisonment.

(PSR ¶¶ 7-8, 37-48, 51, 83-84).

Probation recommends a sentence of probation. (PSR p. 30). The defense requests a noncustodial sentence. (Dkt. 71 at 2).

### III. Discussion

A sentence of imprisonment at the bottom of the Guidelines range of 8 to 14 months would be sufficient but not greater than necessary to comply with the purposes of sentencing.

A custodial sentence is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A). Misappropriating MNPI and then passing that MNPI along to others so that they can profitably trade on it causes harm in many forms, including violating the confidences of companies whose confidential information is stolen, disadvantaging ordinary investors who follow the rules, and undermining confidence in the integrity of the financial markets. The instant offense and its relevant conduct were therefore particularly serious, given that, among other things, Dupont participated with others in an insider trading scheme as the individual who set in motion the entire chain of events by abusing the trust of his employer and misappropriating MNPI to pass it to Cronin so that Cronin could trade on it. Moreover, Dupont's participation in the offense was not an isolated incident. Instead, he passed MNPI to Cronin on a continuing basis over the course of April and May 2020.

Notably, after the public announcement of the Portola acquisition, Dupont lied in connection with both the FINRA inquiry and the law enforcement investigation into his suspected participation in insider trading. That post-announcement conduct bespeaks the seriousness of the offense and the need for just punishment and respect for the law.

A custodial sentence is also necessary to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). Because securities fraud schemes are difficult to uncover, significant punishment is necessary to deter others from similar conduct. *See, e.g.*, *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) ("The district court's assertion that insider trading requires high sentences to alter th[e] calculus" that insider trading is "a game worth playing" given the potential for large profits "is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (citation and internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment

required to deter it."). A custodial sentence is critical to send a message that those who negatively impact the financial markets through securities fraud and insider trading will be caught and face just punishment in Court. Similarly, Dupont's post-announcement lies in connection with both the FINRA inquiry and the law enforcement investigation are deserving of general deterrence.

For the same reasons, the defense's requested noncustodial sentence would not be sufficient to serve the purposes of sentencing. (*Contra, e.g.*, Dkt. 71 at 2). Neither retribution, nor respect for the law, nor general deterrence would be vindicated by imposing no term of imprisonment on an individual who misappropriated MNPI from his employer, shared that MNPI so that his friend could reap illicit profits, and then lied when interested parties started to ask questions.

The defense argues, among other things, that the consequences of Dupont's publicized arrest and his parallel case with the Securities and Exchange Commission (the "SEC") have already punished him and deterred others. (Dkt. 71 at 8). Dupont has suffered reputational and professional consequences, including losing his job and forfeiting his career path. The consequences Dupont has already faced are not trivial and assuredly should be taken into account. But those reputational and professional consequences are the sorts of repercussions one might face in connection with an SEC enforcement action alone. Dupont's criminal violations of the federal securities laws demand more. Moreover, for the reasons set forth above, Dupont has distinguished himself from other participants in insider trading by lying in connection with inquiries by FINRA and law enforcement in an effort to cover his tracks.

## IV. Conclusion

A sentence of imprisonment at the bottom of the Guidelines range of 8 to 14 months would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *Samuel P. Rothschild*
Samuel P. Rothschild
Assistant United States Attorney
(212) 637-2504

cc (by ECF): Max Nicholas, Esq.